IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL PROVENCIO, JR., personally and as successor in interest to DANIEL PROVENCIO, deceased, by his guardian ad litem, Maria Lucero, et al.,<br><br>  Plaintiffs,<br><br>     v.<br><br>PATRICIA L. VAZQUEZ, et al.,<br><br>  Defendants. | CASE NO. 1:07-cv-00069-AWI- JLT<br><br>FINDINGS AND RECOMMENDATION GRANTING MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANT ADAMS<br><br>(Doc. 174) |

Pending before the Court is the motion for summary judgment filed by Defendant, Matthew Adams. (Doc. 174) Plaintiffs have opposed this motion. (Doc. 179) On June 9, 2010, the Court heard argument on the matter and, at the conclusion of argument, took the matter under submission.

I.  **Undisputed Factual Background**

On January 16, 2005, Daniel Provencio ("Provencio") was an inmate at Wasco State Prison ("WSP"). (FAC at 7) During a prison disturbance on that date, Provencio was shot in the head with a rubber projectile from a 40 mm launcher operated by correctional officer, Matthew Palmer. (FAC at 7)

At the time, Correctional Officer, Matthew Adams, was assigned as the "search and escort"

officer which required him to move inmates from place-to-place within WSP. (UMF[1] 2) Adams heard the "Code 1" alarm that was issued as a result of the disturbance and responded to WSP's "hub" to await instructions. (UMF 4,5) While there, Adams heard a call for a gurney to be brought to Building 4, where the disturbance was occurring. (UMF 6) While en route with the gurney, Adams heard a "Code 2" alarm which signified that the disturbance had escalated. (UMF 7) When Adams arrived at the Building 4, he saw many inmates in a large group in the middle of the day room. (UMF 10) When Adams arrived, Provencio had already been shot with the projectile. Provencio was being held by an inmate but was attempting to free himself from the inmate's grasp in an apparent attempt to remain standing. (UMF 14) The officers repeatedly ordered Provencio to "get down," but he failed to do so and continued to struggle against the other inmate's grasp. (UMF 15) Some of the other inmates were down on the floor while others were sitting and yelling obscenities at the officers who had arrived before him. (UMF 10) Adams heard the officers ordering the inmates to "get down" into a face-down, prone position but some of the inmates did not comply. (UMF 11)

Adams joined the group of other four or five officers already present. (UMF 12) The officers were outnumbered by the unrestrained inmates in the day room. (UMF 12) The officers, including Adams, moved to a location that was about seven to nine feet from Provencio. (UMF 13) Provencio and the other inmates spat toward the officers, including Adams. (UMF 16)

At this point, Provencio grabbed a piece of food and threw it at the officers. (UMF 17) Adams sprayed Provencio with pepper spray for about two-to-three seconds. (UMF 19) This caused Provencio to drop to the floor where Adams handcuffed him and removed him from the rest of the inmate group. (UMF 20, 22) Another officer took control of Provencio and escorted him out of Building 4. (UMF 23) After Adams handcuffed another inmate, he went outside and saw that Provencio was kicking and spitting. (UMF 24) Adams went over and assisted in restraining Provencio and assisted in placing him on a gurney for transport to the medical treatment area. (UMF 25) During the transport, Provencio continued fighting and spitting so Adams held him down on the gurney. (UMF 26) Likewise, during the transport, one of the staff members placed a spit mask on Provencio's head. (UMF 27) In the short

---

[1] The Undisputed Material Facts will be referenced as "UMF."

time it took to reach the medical treatment area, the spit mask began to disintegrate due to bleeding from Provencio's head wound. (UMF 26-28)

Once at the medical facility, Adams assisted in moving Provencio onto a treatment bed and placing him on his back. (UMF 29) Nevertheless, Provencio continued to struggle and it appeared to Adams that he was attempting to kick the personnel who came near. (UMF 30) As a result, Provencio was placed in leg restraints. (UMF 31) For another five to ten minutes, Adams held Provencio onto the treatment bed by holding onto his chest and arms. (UMF 32) When the transportation personnel arrived to move Provencio to the ambulance, Adams left the medical treatment area. (UMF 34) Provencio was transported to an area hospital and later died. (FAC at 8)

## II.   Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Where the moving party will have the burden of proof on an issue at trial, he must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007); see also S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 888 (9th Cir. 2003) (noting that a party moving for summary judgment on a claim as to which it will have the burden at trial "must establish beyond controversy every essential element" of the claim) (internal quotation marks omitted). As to an issue which the opposing party will have the burden of proof, the moving party "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." Soremekun, 509 F.3d at 984.

When a motion for summary judgment is properly made and supported, the opposing party cannot defeat the motion by resting upon the allegations or denials of its own pleading but "must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine

1  issue for trial.'" Soremekun, 509 F.3d at 984 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
2  250 (1986)). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise
3  genuine issues of fact and defeat summary judgment." Id.

4        To defeat a motion for summary judgment, the opposing party must show there exists a genuine
5  dispute of material fact. A fact is "material" if it "might affect the outcome of the suit under the
6  governing law." Anderson, 477 U.S. at 248. "[S]ummary judgment will not lie if [a] dispute about a
7  material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for
8  the nonmoving party." Id. at 248.

9        In resolving the summary judgment motion, the court examines the pleadings, depositions,
10  answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c). The
11  evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable
12  inferences that may be drawn from the facts placed before the court must be drawn in favor of the
13  opposing party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1987) (citing
14  United States v. Diebold, Inc., 369 U.S. 654, 655, (1962) (per curiam). Nevertheless, unreasonable
15  inferences may not be drawn, and it is the opposing party's obligation to produce a factual predicate
16  from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F.Supp. 1224, 1244-45
17  (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

18      **A.**    **The Court rejects all claimed disputes of Fact that are not supported by citation to**
19            **evidence or where the evidence cited does not support that a dispute exists.**

20        The Supreme Court has noted that in evaluating a motion for summary judgment, the Court
21  "must distinguish between evidence of disputed facts and disputed matters of professional judgment.
22  In respect to the latter, [the Court's] inferences must accord deference to the views of prison authorities.
23  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to
24  prevail on the merits, he cannot prevail at the summary judgment stage." Beard v. Banks, 548 U.S. 521,
25  530 (2006). The opposing party cannot "'rest upon the mere allegations or denials of the adverse party's
26  pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine
27  issue for trial.'" Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting
28  Fed. R. Civ. Pro. 56(e)). If the opposing party fails to produce evidence sufficient to create a genuine

issue of material fact, the moving party is entitled to summary judgment. <u>Nissan Fire & Marine Ins. Co. V. Fritz Companies</u>, 210 F.3d 1099, 1103 (9th Cir. 2000).

Similarly, Local Rule 260 provides,

> Any party opposing a motion for summary judgment or summary adjudication shall reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, **including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial**. The opposing party may also file a concise "Statement of Disputed Facts," and the source thereof in the record, of all additional material facts as to which there is a genuine issue precluding summary judgment or adjudication. **The opposing party shall be responsible for the filing of all evidentiary documents cited in the opposing papers.** See L.R. 133(j). If a need for discovery is asserted as a basis for denial of the motion, the party opposing the motion shall provide a specification of the particular facts on which discovery is to be had or the issues on which discovery is necessary.

(Emphasis added.) In <u>Burch v. Regents of the Univ. of Cal.</u>, 433 F.Supp.2d 1110, 1126 (E.D. Cal. 2006), the Court held,

> Plaintiff cannot successfully oppose defendants' motion for summary judgment with mere suspicions and undocumented arguments. See <u>S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.</u>, 690 F.2d 1235, 1238 (9th Cir. 1982) (holding that "a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda"). He must instead identify portions of the record that call into question the material facts of this case. In the absence of evidentiary support, the court is not obligated to "search the entire record to establish that it is bereft of a genuine issue of material fact." <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1480 (6th Cir. 1989); see also <u>Newman v. Checkrite Cal., Inc.</u>, 912 F. Supp. 1354, 1377 n. 34 (E.D. Cal. 1995) ("On summary judgment, where our Local Rule 260 requires the parties to cite to [the] evidentiary record, it is not the court's job to go sifting through depositions looking for evidence.").

Despite Plaintiffs' obligation to cite to evidence to support that disputes of fact exist, in many instances, Plaintiffs merely argue that a Fact is disputed without providing any evidentiary support for their argument. In other instances, the evidence cited fails to demonstrate that a genuine dispute of fact exists. Based upon the recited authorities, as to any claimed dispute that is not supported by citation to evidence, the Court determines that these Facts are "admitted" for purposes of this motion. Thus, the Court finds that UMF 3, 12, 14-15, 19, 25, 32 and 35 are admitted. Likewise, where the evidence cited does not support that a dispute exists, the Court determines that these Facts are undisputed for purposes of this motion. On this basis, the Court finds that UMF 13, 16, 21, 22, 24, 26-30, 35 are deemed admitted.

**III.   Discussion**

    **A.   Legal Standards**

        **1.   Section 1983 Actions**

The Civil Rights Act under which this action was filed provides,

> Every person who, under color of [state law]. . . subjects, or causes to be subjected, any citizen of the United States. . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. "Section 1983 . . . creates a cause of action for violations of the federal Constitution and laws." Sweaney v. Ada County, Idaho, 119 F.3d 1385, 1391 (9th Cir. 1997) (internal quotations omitted). The Ninth Circuit has held that "[a] person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

        **2.   Eighth Amendment Claims**

When a prison official uses excessive force against a prisoner, he violates the inmate's Eighth Amendment right to be free from cruel and unusual punishment." Clement v. Gomez, 298 F.3d 898, 903 (9th Cir.2002). "Force does not amount to a constitutional violation in this respect if it is applied in a good faith effort to restore discipline and order and not 'maliciously and sadistically for the very purpose of causing harm.'" Id. quoting Whitley v. Albers, 475 U.S. 312, 320-21 (1986)). To make this determination, the Court may evaluate "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' . . . 'any efforts made to temper the severity of a forceful response'" and the extent of any injury inflicted. Hudson v. McMillian, 503 U.S. 1, 7 (1992).

    **B.   Adams has established that he is entitled to judgment on the First Cause of Action**

        **1.   Adams' use of the pepper spray was not a violation of the Eighth Amendment**

Adams sprayed Provencio with pepper spray during the disturbance that threatened the internal security of the prison. The confrontation had escalated from a "Code 1" event to a "Code 2" event

6

during which time an officer shot Provencio with the rubber projectile. Guards were outnumbered by unrestrained inmates, many of whom were refusing orders to "get down" and were, instead, shouting obscenities at them. Inmates spat at the officers. Provencio was refusing orders to "get down" despite that a fellow inmate was attempting to pull him down. In this already tense situation, Provencio threw food at the officers. In response, Adams discharged his pepper spray at Provencio for a period of two-to-three seconds. This does not amount to a constitutional violation. Clement v. Gomez, 298 F.3d at 903-904 (holding that the good faith use of a small amount of pepper spray to quell a fight was not excessive force).

Although Plaintiffs argue that there is evidence, although not cited or submitted in support of their opposition to this motion, that Provencio did not advance on the officers and did not pose a risk to the officers at the time he threw the food at the officers, this ignores the totality of the circumstances of the escalating prison disturbance in which Adams found himself. Despite Plaintiffs' unsupported arguments, there is no dispute that Provencio had refused and was continuing to refuse to comply with officer commands and he spat and threw food at the officers. While throwing food in other contexts would likely not warrant a use of force, in these circumstances, where unrestrained inmates outnumbered guards, where the inmates were noncompliant with the officers' orders and were shouting obscenities and spitting at the officers and where Provencio's conduct, in particular, threatened the security of WSP, Adam's decision to use the pepper spray was a reasonable attempt to quell the disturbance. (UMF 21) The Constitution protects inmates from the use of force that is sadistic and malicious. It does not mandate that prison officials, in the midst of trying to regain control of a situation that is threatening the safety and security of the institution, to allow an inmate to incite a further escalation of the event by throwing food nor does it require officials wait until an inmate deigns to comply with orders.

To the contrary, judgments such as that made by Adams in this instance and under these circumstances are entitled to wide deference. Hudson at 6. Given that Provencio clearly and admittedly participated in a situation that required a response by correctional officers to regain order, the Eighth Amendment does not entitle Plaintiffs to second guess the method employed to do so. The question posed by the Eighth Amendment, then, is whether the force used was applied in a good-faith effort to restore discipline, and the facts clearly demonstrate that it was.

Further, the fact that Provencio felt discomfort from the use of the OC spray and experienced breathing difficulty as a result is not sufficient to raise a triable issue of fact as to whether the force used was excessive. If pepper spray was benign and caused no pain, it would be ineffective and would serve no purpose as a tool to maintain or restore discipline. Because the purpose of the OC spray is to cause a painful burning sensation, this is not evidence that the force used was excessive. In short, there is no evidence presented that the use of the pepper spray was malicious and sadistic.

### 2. Adams' failure to flush the pepper spray was not a violation of the Eighth Amendment

Plaintiffs seem to contend that Adams' use of pepper spray was a violation of the Eighth Amendment because he failed to flush Provencio's face afterward although water was available. (Response to UMF 27)  However, as noted by Adams, MTA Drugich testified that Provencio's face was not flushed with water because he was wearing a spit mask and he was wearing the mask because he spat at personnel whenever it was removed. Thus, rather than a situation where an officer refused to wash the pepper spray away, Provencio's conduct prevented Adams from doing so.

Nevertheless, the Plaintiffs rely upon Clement v. Gomez, 298 F.3d 898 to demonstrate that the failure to flush Provencio's face with water constituted cruel and unusual punishment. In Clement, officials were faced with a violent fight inside a cell at Pelican Bay State Prison. Id. at 901.  Inmates failed to comply with officers' orders to stop and to "get down on the floor." Id.  At least two, two-to-five second bursts of pepper spray were deployed into the cell. Id. at 901-902.  The spray drifted into neighboring cells which caused discomfort and breathing difficulties. Id. at 902.  Prison officials attempted to mitigate the effects of the spray by using fans which caused the effluent to disperse to other cells.  Id.  Not until four hours later did prison officials begin escorting inmates to their regularly scheduled showers. Id.

On these facts, Clement decided that the use of the pepper spray was not a violation of the Eighth Amendment. Id. at 903-904.  The Court held,

> [T]he inmates have failed to establish that the officials applied the pepper spray maliciously and sadistically for the very purpose of causing harm. The prison officials administering the spray claim that the second application was dispensed because the bodies of the fighting inmates had blocked the initial spray. In fact, the defendants claim that some of the pepper spray ricocheted back onto them after the first shot. The final

> spray was administered immediately thereafter. Even if the allegation of the neighboring inmates is true, viz, that the final spray was dispensed after the sounds of coughing and gagging were heard from the cell, this allegation alone does not lead to the inference that the official used the pepper spray 'maliciously and sadistically for the very purpose of causing harm."

Id. As to whether the officials were deliberately indifferent to the inmates' medical care, the Court held affirmed the denial of summary judgment. Id. at 904. The Court observed,

> The officials, however, may have been deliberately indifferent to the prisoners' serious medical needs if, in fact, they were aware of the harmful effects of the pepper spray and of the inadequacy of their ventilation methods and yet **purposefully refused to provide showers, medical care,** or combative instructions or to develop an adequate policy to address obvious risks.

Id., emphasis added. Notably, the Ninth Circuit did not decide that the officers' actions constituted a constitutional deprivation but, instead, determined only that disputed factual issues required a trial. The Court noted that resolution of the issue may require the presentation of evidence related to the unique security issues that interfered with the provision of medical care when it observed,

> We note that the constraints facing the officials in this case differ from most cases involving the deprivation of medical needs. See *Whitley v. Albers*, 475 U.S. 312, 320, 89 L. Ed. 2d 251, 106 S. Ct. 1078 (1986) ("The State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities."). The four-hour delay in this case followed a violent prison fight, which may have necessitated restrictions on inmate movement in the pod. In his affidavit, the control booth officer stated that due to the potential for violence, inmates housed in the security housing unit must be escorted in and out of the unit by two officers. In addition, after a disturbance, it is customary to restrict all inmate movement in a pod until the incident has been attended to. These competing tensions -- the prisoners' need for medical attention and the government's need to maintain order and discipline -- may be important to the resolution of whether the officials had the requisite subjective intent.

Id. at 905 n. 4. Thus, rather than setting a bright-line rule that pepper spray must be flushed from an inmate's face within a proscribed period of time, the Court outlined that security breaches could be considered in evaluating whether the medical deprivation was malicious and sadistic.

Unlike in Clement, here it was Provencio's action that prevented him from having his face flushed with water. Whenever the spit mask was removed, he attempted to spit at the personnel nearby. Given that blood was present in the fluid that he spat, the health danger posed by his spitting was great and prevented him from receiving medical care for the pepper spray and the head injury. Although Plaintiffs characterize Provencio spitting as his attempts to clear his mouth of blood rather than as acts of aggression and noncompliance, this inference is not supported by the evidence. Instead, this is

9

contradicted by the evidence that Provencio fought with the officers, kicked his legs and prevented attempts at medical intervention nearly until nearly the moment that he became unconscious.

Plaintiffs rely also on LaLonde v. County of Riverside, 204 F.3d 947 (9th Cir. 2000) to support their position that the failure to flush Provencio's face with water constituted a use of excessive force. However, LaLonde is factually and legally distinct. In that case, officers used pepper spray on a man who was alleged to have caused a noise disturbance in his apartment. Id. at 950-951. After the officers sprayed LaLonde, he became compliant. Nevertheless, the officers made him sit handcuffed on a sofa for 20 to 30 minutes and during this time, neither of the officers flushed the pepper spray from his face. Id. at 952-953. Although the officers claimed that he continued to resist, this was contrary to the witness' testimony and, when two other officers arrived on the scene, they immediately wiped his face without any difficulty. Id. at 953.

The Court of Appeals determined that the trial court erred in granting a directed verdict to the defendants on this point. The Court analyzed LaLonde's Fourth Amendment claim and concluded that the failure to flush the pepper spray from LaLonde's face *after* he had "fully surrendered and was under their control" was analogous to a situation where an officer "sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control." LaLonde at 961.

Notably, the situation before the Court here involves, not the Fourth Amendment, but the more deferential standard of the Eighth Amendment. Moreover, unlike in LaLonde, here the only evidence presented is that Provencio was combative and spitting during the entire time he remained in the medical facility until he lost consciousness. Thus, Provencio had not "fully surrendered" and, although he was restrained on the treatment table, he took active and repeated steps to prevent receipt of medical treatment for all of his medical conditions, including the pepper spray. Given this situation, LaLonde fails to demonstrate that Adams' action in failing to flush the pepper spray constituted a violation of the Eighth Amendment.[2]

---

[2] Moreover, in a recent case, the Court determined that the failure to treat the effects of pepper spray suffered by an inmate for over an hour was not a constitutional violation. Gibson v. Woodford, 2010 U.S. Dist. LEXIS 12979, 11-12 (E.D. Cal. Feb. 12, 2010) The Court held, "On the facts of this case, this relatively brief delay did not amount to deliberate indifference . . . Similar or longer delays are often encountered in emergency rooms across the country under comparable circumstances." Id.

### 3. Adams' use of physical force did not violate the Eighth Amendment

When Provencio arrived at the medical treatment area, he remained noncompliant. (UMF 30, 32) Adams describes him as "combative" in that he was attempting to kick personnel and attempted to spit in the face of a nurse. (Adams' Dec at 4-5) Due to this, Adams and another officer held Provencio down by his chest and arms for a period of about ten minutes until he agreed to comply with instructions to stop resisting and agreed to stop struggling. (UMF 32; Adams' Dec at 5) The only time that Adams touched Provencio in the medical treatment facility was when Provencio was physically combative. (UMF 35)

Plaintiffs do not contend that Adams inflicted any force or pain compliance techniques.[3] They do not assert that Adams held Provencio down for a malicious or sadistic purpose. Instead, they contend that when Adams "physically restrained" Provencio while he was on the treatment table in the medical area, that "under the circumstances, [it] was unnecessary and excessive." (FAC at 8-9) In describing the "circumstances," Plaintiffs assert that "Provencio was laying in the emergency room, mortally wounded and bleeding profusely from his head wound, handcuffed, suffering extreme pain from the pepper spray exposure . . . and with his face covered by a 'spit hood', . . ." (FAC at 8) Plaintiffs claim that Adams "restrained Provencio by holding him down with both of his hands in the chest area and arms" and by "restraining Provencio by using both of his hands to hold Provencio down by the shoulders." (FAC at 8)

Plaintiffs claim, without citation to any evidence or expert opinion, that "[t]he only need to touch him was to staunch the bleeding, let him breath, and decontaminate him." (Response to UMF 35) Plaintiffs offer no evidence to counter that Provencio was combative, that he kicked at the personnel, that he spat at them and that he actively resisted attempts to provide him medical care. Instead, Plaintiffs offer an alternative explanation for Provencio's conduct–again without any evidentiary support–that he was attempting to clear the blood out of his mouth when he spat at personnel and that he was in his

---

[3] The Court notes that Plaintiffs offer no argument in their opposing points and authorities that Adams' efforts to hold Provencio against the treatment bed in the medical treatment area constituted excessive force. In fact, they make no mention of this claim at all. Plaintiffs' silence on this issue could be construed as a non-opposition to Adams' motion in this regard. However, in an abundance of caution, the Court analyzes the merits of defendant's argument.

"death throes," apparently explaining why he kicked at personnel and struggled against the restraints. If, in fact, "death throes" can cause a person to appear to be purposefully combative and had Plaintiffs offered any evidence whatsoever to support this theory, the Court could rely upon it. Instead, they offer only their speculation without regard for the requirements of Rule 54 and Local Rule 260. This is insufficient. Instead, the Plaintiffs "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore, the Court cannot find that there is a genuine dispute of material fact as that Adams' efforts to counter Provencio's combative conduct was done maliciously or sadisticially.

### 4. Conclusion

For the reasons set forth above in the discussions related to these causes of action, the Court recommends that Adams' motion for summary judgment on the Fifth Cause of Action be **GRANTED**.

### C. Adams has established that he is entitled to judgment on the Fifth Cause of Action

The Fifth Cause of Action alleges that Provencio Jr. has suffered a deprivation of his Fourteenth Amendment right to the familial relationship with his father, Provencio. In support of this assertion, he relies upon the allegations of the raised in the First Cause of Action. For the reasons set forth above in the discussions related to these causes of action, the Court recommends that Adams' motion for summary judgment on the Fifth Cause of Action be **GRANTED**.

### D. Adams has established that he is entitled to judgment on the Sixth Cause of Action

The Sixth Cause of Action alleges that Plaintiffs Nancy Mendoza and Johnny Gallegos have suffered a deprivation of their Fourteenth Amendment right to their familial relationship with Provencio. They rely upon the allegations raised in the First Cause of Action. For the reasons set forth above in the discussions related to these causes of action, the Court recommends that Adams' motion for summary judgment on the Sixth Cause of Action be **GRANTED.**

### RECOMMENDATION

Based on the foregoing, the Court recommends,

1. That the motion for summary judgment on the First, Fifth and Sixth Causes of Action be **GRANTED**; and
2. Because this disposes of all causes of action related to Defendant Adams, that judgment

1  be entered in Matthew Adams' favor as to the entire matter.

2  These Findings and Recommendations are submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within fourteen days after being served with a copy, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be filed within fourteen days after service of the objections. The District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  Failure to file objections within the specified time may waive the right to appeal the District Judge's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **June 16, 2010**                              /s/ Jennifer L. Thurston
                                                      UNITED STATES MAGISTRATE JUDGE