IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL PROVENCIO, JR., personally and as successor in interest to DANIEL PROVENCIO, deceased, by his guardian ad litem, Maria Lucero, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>PATRICIA L. VAZQUEZ, et al.,<br><br>Defendants. | CASE NO. 1:07-cv-00069-AWI- JLT<br><br>FINDINGS AND RECOMMENDATION GRANTING MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANT SONGER<br><br>(Doc. 159) |

Pending before the Court is the motion for summary judgment filed by Defendant, Michael Songer. (Doc. 159) Plaintiffs have opposed this motion. (Doc. 181) On June 9, 2010, the Court heard argument on the matter and, at the conclusion of argument, took the matter under submission.

**I.   Undisputed Factual Background**

On January 16, 2005, Daniel Provencio ("Provencio") was an inmate at Wasco State Prison ("WSP").[1] (FAC at 7) During a prison disturbance on that date, Provencio was shot in the head with a rubber projectile from a 40mm launcher operated by correctional officer, Matthew Palmer. (FAC at 7) Afterward, Provencio was taken to the Treatment and Triage Area ("TTA") at WSP where he lapsed into

---

[1] The background facts are taken from the Fifth Amended Complaint for Damages ("FAC").

1

1  a coma and later died. (FAC at 7-8)

2  The TTA was a part of the medical unit located at WSP. (UMF[2] 16) Although the TTA is staffed 24-hours per day, it is not an "emergency room" and is designed to address only minor medical problems and minor injuries. (UMF 17) Although nurses and other medical assistants are on duty at the TTA around the clock, doctors keep more traditional hours but there is a doctor on-call at all times.

Medical emergencies at WSP require the patient to be transferred to a hospital outside of WSP. (UMF 17) The official policy of the California Department of Corrections and Rehabilitation ("CDCR") allows any WSP staff member to transfer a patient outside of WSP if they feel it is appropriate to do so without the prior approval of a doctor. (UMF 20) Nevertheless, Nurse David Hicks, the nurse who attended to Provencio in the TTA, believed that he was required to obtain permission from a doctor before such a transfer could be made. (Response to UMF 21) Hicks testified that at some point in the past, before the incident with Provencio, Dr. Songer told him that he needed a doctor to make the determination as to whether a patient would be transferred outside of WSP.[3] (Hicks' Testimony at 26:8-28:1)

Defendant, Dr. Michael Songer was the Chief Medical Officer at WSP at the time of the incident involving Provencio. (UMF 2) He was not present at WSP at the time of the incident nor was he personally involved in it. (UMF 1) During the time Dr. Songer was the Chief Medical Officer, the doctors at WSP met daily to discuss the inmate-patients who were currently receiving care so that the next shift of medical personnel would be familiar with the nature of the patient's infirmity. (Plaintiffs' response to UMF 3) Also, Dr. Songer attended a monthly meeting, at which various committee members discussed medical cases that required the inmate to be transported out of WSP for emergency treatment. Id.

Dr. Songer did not have the authority to determine the number of medical staff positions

---

[2] "UMF" refers to the Statement of Undisputed Facts submitted by Songer. "DMF" refers to the Statement of Disputed Facts submitted by Plaintiffs.

[3] The Court notes that Plaintiffs failed to provide the transcript of Hicks' deposition. However, Plaintiffs provided it in opposition to Defendant Adams' motion for summary judgment. The Court does not excuse this failure and notes that this is a violation of Local Rules 260(a) and 133(j). The Court will not routinely seek out evidence not submitted in accordance with the Local Rules.

2

1  allocated to WSP. (UMF 10) Instead, his responsibility was limited to ensuring that medical staff
2  members were qualified for their positions by verifying that each had completed the medical training
3  required by the position before hiring. (UMFs 3-9 and responses thereto, UMF 11) Once hired, Dr.
4  Songer was responsible for ensuring that the new medical employees were oriented to the policies and
5  procedures of CDCR. (UMF 9)

## II.     Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Where the moving party will have the burden of proof on an issue at trial, he must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007); see also S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 888 (9th Cir. 2003) (noting that a party moving for summary judgment on a claim as to which it will have the burden at trial "must establish beyond controversy every essential element" of the claim) (internal quotation marks omitted). As to an issue which the opposing party will have the burden of proof, the moving party "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." Soremekun, 509 F.3d at 984.

When a motion for summary judgment is properly made and supported, the opposing party cannot defeat the motion by resting upon the allegations or denials of its own pleading but "must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" Soremekun, 509 F.3d at 984 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." Id.

To defeat a motion for summary judgment, the opposing party must show there exists a genuine

dispute of material fact. A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. "[S]ummary judgment will not lie if [a] dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp, 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, (1962) (per curiam). Nevertheless, unreasonable inferences may not be drawn, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F.Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

**III.  Discussion**

    **A.  Legal Standards**

        **1.  Section 1983 Actions**

The Civil Rights Act under which this action was filed provides:

> Every person who, under color of [state law]. . . subjects, or causes to be subjected, any citizen of the United States. . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. "Section 1983 . . . creates a cause of action for violations of the federal Constitution and laws." Sweaney v. Ada County, Idaho, 119 F.3d 1385, 1391 (9th Cir. 1997) (internal quotations omitted). "To the extent that the violation of a state law amounts to the deprivation of a state-created interest that reaches beyond that guaranteed by the federal Constitution, Section 1983 offers no redress." Id.

The statute plainly requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff. See Monell v. Department of Social Services, 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976). The Ninth Circuit has held

that "[a] person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

## 2. Eighth Amendment Claims

Deliberate indifference to a serious medical need violates the Eighth Amendment's proscription against cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97 (1976); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). "In the Ninth Circuit, the test for deliberate indifference consists of two parts." Jett, 439 F.3d at 1096. First, the plaintiff must show a serious medical need by demonstrating that failure to treat the prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Jett, 439 F.3d at 1096; McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir.1992), overruled in part on other grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). "Second, the plaintiff must show the defendant's response to the need was deliberately indifferent." Jett, 439 F.3d at 1096. A prison official is "deliberately indifferent" if he actually knows that a prisoner faces a substantial risk of serious harm and disregards that risk. Farmer v. Brennan, 511 U.S. 825, 837 (1994). In other words, the second prong is satisfied by the plaintiff showing "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Jett, 439 F.3d at 1096.

"Deliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004). It requires "more than ordinary lack of due care for the prisoner's interests or safety." Farmer, 511 U.S. at 835, (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)). The requisite state of mind lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." Id. at 836. It may be shown by "the way in which prison physicians provide medical care." McGuckin, 974 F.2d at 1062 (9th Cir. 1992). Prison officials demonstrate "deliberate indifference" when they are aware of the patient's condition but "deny, delay or intentionally interfere with medical treatment." Jett, 439 F.3d at 1096.

///

///

### B. Third Cause of Action

#### 1. Provencio had a serious medical need

The existence of an injury that a reasonable doctor would find important and worthy of treatment, the presence of a medical condition that significantly affects an individual's daily activities, or the existence of chronic and substantial pain are examples of indications that a prisoner has a "serious" need for medical treatment. McGuckin, 974 at 1059-1060 citing Wood v. Housewright, 900 F.2d 1332, 1337-41 (9th Cir.1990); Hunt v. Dental Dept, 865 F.2d 198, 200-01 (9th Cir.1989).

It is undisputed that Plaintiff died after being struck in the head by a rubber projectile. Given Dr. Songer's failure to address this element in his motion, the Court presumes that Provencio's had a serious medical need for purposes of Eighth Amendment analysis.

#### 2. Dr. Songer did not act with deliberate indifference to Provencio's serious medical need

The thrust of the allegations against Dr. Songer in the Third Cause of Action is that he responded to Provencio's serious medical need with deliberate indifference. Farmer, 511 U.S. at 834. In essence, Plaintiffs' claims are twofold: they allege that Dr. Songer failed to adequately staff and equip WSP and that Dr. Songer failed to adequately train the medical staff. Due to these failures, Plaintiffs allege that Provencio failed to received timely and adequate medical care which resulted in his death. Because Plaintiffs will have the burden of proving that Dr. Songer acted with deliberate indifference at trial, Dr. Songer expends the entirety of his energies in this motion demonstrating that there is a lack of evidence on this point. Soremekun, 509 F.3d at 984

##### i. Dr. Songer did not have the authority to determine staffing levels or the proper medical equipment at WSP

Plaintiffs admit that Dr. Songer did not have the authority to determine the number of doctor positions that were allocated to WSP. (UMF 10) Instead, Dr. Songer's obligation was to schedule when the medical doctors allocated to WSP would work. Plaintiffs contend that Dr. Songer was required to have doctors on duty 24-hours per day at WSP or, at a minimum, to have doctors on-site at WSP whenever inmates were out of their cells. Plaintiffs assert alternatively, that even if he was not required

to schedule the doctors in this manner, he "could" have done so.[4] The affirmative evidence shows that Dr. Songer ensured that a medical doctor was present at WSP or on call 24-hours per day. The Court has not been cited to any evidence identifying the number of medical emergencies before the incident with Provencio that occurred during times that doctors were not on duty at WSP nor that any other inmate had suffered as a result of the "on-call" status of the doctors. Thus, the Court cannot find that Dr. Songer's decision not to staff WSP around-the-clock, demonstrates a deliberate indifference to a known, systemic and substantial risk of harm. Madrid v. Gomez, 889 F. Supp. at 1257.

On the other hand, the undisputed evidence demonstrates that the TTA was not an emergency room, was not licensed as an emergency room and was not stocked with medical equipment typically found in an ER. (UMF 16-20) The TTA was stocked with the equipment needed to address the minor medical problems suffered by inmates. Although the FAC criticizes Dr. Songer for not stocking the TTA with equipment to deal with serious medical emergencies, there is no evidence that transferring medical emergencies to an area hospital resulted in any inmate, before Provencio, suffering any medical deprivation. Moreover, Plaintiffs do not raise any disputes of fact as to this issue, do not offer any evidence that any inmate, including Provencio, suffered injury caused by the need to transfer the patient off site and do not offer any cognizable argument to support the claims in the FAC on this topic. Therefore, the Court finds no evidence that Dr. Songer acted with deliberate indifference in determining the equipment that was appropriate for the TTA.

Finally, Plaintiffs criticize Dr. Songer for failing to have a one-size-fits-all approach to injuries resulting from the use of the launcher. At oral argument, the attorney for Johnny G. Provencio argued that *anytime* an inmate is struck in the head with a rubber projectile, the policy should have required that the inmate be sent out of WSP for emergency medical attention. The attorney for Plaintiff Nancy Mendoza argued that the policy should have been that a doctor *must* evaluate the inmate before deciding

---

[4] Although in their opposition Plaintiffs cite generally to Plata v. Schwarzenegger, 2010 U.S. App. Lexis 8969 for the proposition that medical care provided to CDCR inmates is unconstitutional. In doing so, they fail to provide any analysis of this decision, or the proceedings leading up to it, so to justify their implied argument that this decision *automatically* requires this Court to find Dr. Songer liable. Likewise, although Plaintiffs cited cases at the time of the oral argument namely, Hoptowit v. Ray, 682 F.2d 1237, 1252-53 (9th Cir.1982) and Madrid v. Gomez, 889 F. Supp. 1146, 1256-58 (N.D. Cal. 1995), neither case holds that a prison official must staff the medical facility 24-hours per day with a doctor or that one must be on-site whenever inmates are out of their cells.

7

whether to transport the inmate away from WSP. The Court rejects both suggested policies in favor of the CDCR's policy that any staff member can order the inmate to be transported to an area hospital if the patient's care warrants it.

In any event, here the registered nurses immediately called Dr. Ramos and requested that he return to WSP to treat Provencio. (Hicks Depo at 40:14-42:20) The nurses did not believe that Provencio had suffered a life-threatening injury but felt that Dr. Ramos' presence was needed to stitch Provencio's wound. (Id.; Id. at 50:9-12.) Plaintiffs have offered no medical evidence that anything about Provencio's symptoms at that time should have alerted Hicks that a more serious injury had occurred. In fact, at oral argument the attorney for Nancy Mendoza admitted that Provencio's subdural hematoma was a "slow bleed" as explanation for why his conduct, initially, was not typical for this type of a head injury. Rather than being lethargic and non oriented, Provencio was very active and oriented. Once Provencio's condition evidenced itself, through display of symptoms consistent with a brain injury, i.e. lethargy, lack of orientation, unconsciousness (Hicks Depo at 50:9-12), Dr. Ramos immediately ordered Provencio transferred to an area hospital.

Although being struck on the head by a rubber projectile posed the potential of a serious brain injury, Dr. Songer had not seen any inmate suffer a serious injury from being struck. (Songer Depo at 81:20-82:12) Dr. Ramos remembered that there was one other inmate that suffered a critical injury as a result but that inmate survived. (Ramos Depo at 73:24-74:15) Thus, the evidence demonstrates that patients suffer different injuries of differing severities after being struck on the head by a rubber projectile. Thus, the Court concludes that the Constitution did not require Dr. Songer to have established a policy that required a singular response to such injuries. Moreover, based upon this uncontradicted evidence of the few incidents of head injuries related to the use of the launcher, the Court does not find that Dr. Songer was aware of a known risk posed by the policies in place and deliberately disregarded these risks.

### ii. Dr. Songer did not have the duty to train the medical staff at WSP

Plaintiffs dispute UMF 3 through 9 based upon their contention that Dr. Songer had the duty to train the medical staff about the proper treatment of patients with head injuries and that he had, in fact, provided such training in the past. To this end, Plaintiffs cite to evidence that it was customary for the

medical staff at WSP to meet daily to discuss the status of each patient. Dr. Ramos testified that this occurred so that the medical staff coming on duty would be informed as to the status of the patients by the medical staff going off duty. (Ramos Depo at 93:24-95:4) Dr. Ramos explained that there were many reasons for the daily report but each related to ensuring that the other doctors were informed about the medical status of the patients. (Ramos Depo at 94:18-25)

Nevertheless, Plaintiffs assert that because Dr. Ramos agreed that a purpose of these daily sessions was "remedial," that this proves that Dr. Songer provided medical training to the medical staff. (Responses to UMF 3-9) The Court disagrees. Although Plaintiffs are entitled to the benefit of all reasonable inferences from the evidence, this is not a reasonable inference but, instead, it is a mischaracterization of the above recited evidence.

Plaintiffs seem to contend also that because Dr. Songer attended monthly committee meetings at which "Code 3" patients and inmate deaths were reviewed, that this proves that he provided medical training to medical staff. (Songer Depo at 51:25-53:4, 78:22-79:21) Although there is little evidence about what happened at these meetings (Id.), the evidence suggests that they constituted a "peer review" that is required by California Code of Regulations, Title 22 § 70703, subd. (a). Arnett v. Dal Cielo 14 Cal.4th 4, 10 (1996) ["These committees evaluate physicians applying for staff privileges, **establish standards and procedures for patient care, assess the performance of physicians currently on staff, and review such matters as the need for and results of each surgery performed in the hospital**, the functioning of the patient records system, the control of in-hospital infections, and the use and handling of drugs within the hospital."], emphasis added; Mileikowsky v. West Hills Hospital & Medical Center, 45 Cal. 4th 1259, 1267 (Cal. 2009). Notably, there is no evidence that Dr. Songer used these meetings as an opportunity to provide medical training. (UMFs 3-8)

Plaintiffs rely also on the testimony of Nurse David Hicks as evidence that Dr. Songer provided medical training. Hicks testified that on one occasion at some, unspecified time in the past before the Provencio incident, he was chastised by Dr. Songer for sending an asthmatic patient for emergency care outside of WSP without a doctor's approval. (DMF 7) Hicks testified that Dr. Songer told him that he made the "right call" in sending the patient away but that he should have obtained doctor approval first. (Id.) Assuming that this constitutes training, and taking this evidence most favorably to the Plaintiffs,

9

the training given related to a procedure for transferring a patient, not to the proper medical treatment to give.

Still, there is no evidence that the delay occasioned by this training caused constitutional harm. As pointed out by Dr. Songer in his Reply Brief, Hicks' testimony indicates that, initially, he did not believe that Provencio had suffered a serious injury. His diagnosis was a laceration and he requested that Dr. Ramos be called only so that he could return to WSP to suture it. (Hicks Depo at 40:18-42:20) Hicks did not believe that Provencio had suffered a brain injury because he was alert and oriented. (Id.) Until Provencio became unresponsive, about one minute before Dr. Ramos arrived at Provencio's bedside, Hicks did not feel that Provencio had suffered a life-threatening injury or that he needed to be transferred to a hospital. (Hicks Depo at 50:9-12; Ramos Depo at 52:2-20; 53:8-14) Therefore, there is no evidence that the earlier instruction by Dr. Songer, that Hicks had to have the approval of a doctor before transferring an inmate to a hospital outside WSP, had any bearing on the medical care that Provencio received.

Finally, Plaintiffs assert that because Dr. Songer issued written "protocols" to staff, that this is evidence that he provided medical training to them. Dr. Ramos' testimony established that there was one or more binders containing a compilation of memos on various topics. For example, Dr. Ramos testified that he remembered receiving memos about proper positioning of a patient wearing a spit mask and handcuffs, about how to determine to which outside hospital a patient would be sent and about the prohibition of staff bringing cell phones into WSP. Dr. Ramos testified that these memos were distributed to the staff when they were issued and were kept in binders that were maintained in Dr. Songer's office. He reported that the memos were authored by a range of people including Dr. Songer, the warden, by officials in the Sacramento regional office, by "certain lieutenants or captains, and sometimes the regional medical director also." (Ramos Depo at 101:4-9) Thus, in light of the evidence that numerous people authored these memos, in light of the absence of any evidence of the topics of any of the memos that Dr. Songer wrote and in light of Dr. Songer's affirmative evidence that he did not provide *medical* training to the medical staff (Songer Dec at 2), the Court concludes that Plaintiffs have failed to submit evidence to support that there exists a genuine, triable issue of material fact.

Alternatively, Plaintiffs contend that Dr. Songer *should have* provided medical training to the

medical staff. (Responses to UMF 5-9) For this position, they rely upon the testimony of their retained expert, Dr. Clark. Dr. Clark opined that Dr. Songer had the obligation to train the medical staff about the medical consequences of an inmate getting shot in the head with a rubber projectile and about the corresponding treatment that was required.[5, 6]

In the cited portions of his testimony, Dr. Clark seems to say only that if he was the Chief Medical Officer at WSP, *he* would have provided training to the medical staff about the injuries[7] that may result from being shot in the head with a rubber projectile.[8] The only authority outlined for this opinion was Dr. Clark's reliance upon the "captain of the ship" doctrine. In their opposition, Plaintiffs echo this as the basis for their claim. The "captain of the ship" doctrine has been recognized in California state law malpractice claims for decades. Baumgardner v. Yusef, 144 Cal.App.4th 1381, 1397 (2006). It recognizes a surgeon's liability for the actions of others working under his supervision and control during the operation. Id. The "captain of the ship" doctrine is a negligence standard that is based upon the doctrine of respondeat superior. Id. Because there is no respondeat superior liability in this § 1983 case and because negligence is insufficient to demonstrate sufficiently culpable conduct, Plaintiffs fail to explain how this doctrine gives rise to liability here.

---

[5] At oral argument, Plaintiffs attorneys argued variously that the medical staff should not have had discretion to determine whether an injury such as Provencio's could be treated at WSP and that any time an inmate is shot in the head with a projectile that he must be sent for off-site treatment but argued somewhat inconsistently that this decision should have been made by a doctor at the scene, as it was here. They cite no evidence to support either theory.

[6] The Court is mindful that the opinions of experts are entitled to little weight in determining whether a condition is "cruel and unusual punishment" under the Eighth Amendment. Toussaint v. McCarthy (Toussaint IV), 801 F.2d 1080, 1107 n. 28 (9th Cir. 1986).

[7] Apparently, Dr. Clark presumes that there are only a limited number of injuries that could result without detailing any of the expected injuries. Without evidence, the Court cannot do so. Moreover, this disregards the evidence that was submitted that only one other person suffered a critical injury from being shot in the head with a rubber projectile. (Songer Depo at 81:20-82:12; Ramos Depo at 73:24-74:15)

[8] Although "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact," Fed. R. Evid. 704, it is improper for an expert witness to offer an opinion on an ultimate issue of law. Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1017 (9th Cir. 2004). Likewise, the Ninth Circuit has held that a plaintiff cannot avoid summary judgment "by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless." Billington v. Smith, 292 F.3d 1177, 1189 (9th Cir. 2002); accord Reynolds v. County of San Diego, 84 F.3d 1162, 1170 (9th Cir. 1996) ("The fact that an expert disagrees with an officer's actions does not render the officer's actions unreasonable."), overruled on other grounds by Acri v. Varian Assocs., Inc., 114 F.3d 999 (9th Cir. 1997) (en banc).

It is undisputed that when the medical staff members were hired, each had received already the medical training that was required for the job. (Opposition at 2:14-17) The opposition concedes that "Dr. Songer was not a professor of medicine or nursing." Id. The suggestion, then, that Dr. Songer was required to train the medical staff, upon their hiring, on the universe of injuries or other medical conditions that could be suffered by inmates and to teach them a particular medical treatment for each, defies logic. If there is legal authority for their position, Plaintiffs have failed to direct the Court's attention to it. Therefore, the Court finds that Dr. Songer did not have a duty of constitutional proportions to train the medical staff at WSP.

### iii. The allegations against Dr. Songer as the Chief Medical Officer of WSP appear to be an attempt to impose respondeat superior liability

There is no respondeat superior liability under 42 U.S.C. § 1983. Palmer v. Sanderson, 9 F.3d 1433, 1437-38 (9th Cir. 1993); Monell, 436 U.S. at 691 (the supervisor of someone who allegedly violated a plaintiff's constitutional rights is not made liable for the violation by virtue of that role). "Liability under § 1983 arises only upon a showing of personal participation by the defendant. (Citation.) A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them. There is no respondeat superior liability under § 1983." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989), citation omitted.

Recently, the Supreme Court rejected that a supervisor can be held liable for his mere "knowledge and acquiescence" in unlawful conduct by his subordinates. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (U.S. 2009). The Court held,

> . . . respondent believes a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution. We reject this argument. Respondent's conception of "supervisory liability" is inconsistent with his accurate stipulation that petitioners may not be held accountable for the misdeeds of their agents. **In a § 1983 suit or a *Bivens* action--where masters do not answer for the torts of their servants--the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.**

Id., emphasis added. Despite the instruction of Iqbal, Plaintiffs' "failure to train" allegations appear to be an attempt to "get around" the prohibition on respondeat superior liability. In essence, when

1  Plaintiffs' arguments are reduced to their simplest form, it appears that they believe *every* act of
2  wrongdoing by an employee may be laid at the feet of his supervisor.  This may be true in a negligence
3  action, but in this constitutional litigation, this position is insufficient to impose liability.  Therefore, the
4  Court finds that there is no evidence that action taken by Dr. Songer caused the damages claimed here.

### iv. There is no evidence that delay in providing medical treatment caused Provencio harm

7  The Constitution does not require that inmates receive state-of-the-art medical care. Instead, they
8  must be provided only the level of care that is consistent with "the minimal civilized measure of life's
9  necessities" (Rhodes v. Chapman, 452 U.S. 337, 347(1981)), which is care sufficient to prevent the
10  unnecessary and wanton infliction of pain or death. Estelle, 429 U.S. at 103-04.  A delay in providing
11  medical care may be sufficient to demonstrate deliberate indifference to the inmate's serious medical
12  need. Id. at 104-05. To establish this claim, however, a plaintiff must show that the delay was harmful.
13  See Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir.1994) (per curiam); McGuckin, 974 F.2d at 1059;
14  Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir.1990); Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th
15  Cir.1989); Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985) (per
16  curiam).

17  The evidence is undisputed that the on-call doctor, Dr. Ramos, was consulted by telephone
18  immediately after the incident and was told that Provencio had been shot in the head with a "rubber-
19  tipped projectile." (Ramos Dec at ¶ 6) It is undisputed that Dr. Ramos arrived at Provencio's bedside
20  within 50 minutes.  (DMF 11) Notably, Plaintiffs do not assert that Dr. Ramos should have ordered
21  Provencio's transfer out of WSP before seeing him or that the symptoms of Provencio's condition
22  warranted this occurring earlier.  In fact, the Plaintiffs fail to provide any medical evidence, in the form
23  of expert testimony, about Provencio's condition.  The Court has no basis upon which to determine
24  whether Provencio's injury was treatable, the likelihood of recovery from such an injury of treated
25  immediately, whether Provencio suffered pain or the amount of pain that Provencio suffered or whether
26  pain would have been avoided if immediate medical care had been provided or whether Provencio was
27  demonstrating symptoms consistent with an intracranial bleed and, if so, when he began displaying these
28

1  symptoms.[9] (FAC at 20)

2  As their sole medical evidence, Plaintiffs' cite to Dr. Ramos' testimony that the earlier a person with an intracranial bleed receives medical treatment, the more likely the person is to survive. (DFM 14) However, Dr. Ramos testified also that there was no way to determine whether Provencio would have fared better had an ambulance been called immediately because the medical treatment given would depend upon the observations of the medical doctor. (Ramos Depo at 127:3-14) Therefore, the Court cannot find that, even if the staffing schedule was unlawful and even if Dr. Songer was required to provide medical training to the medical staff, that either failure caused constitutional harm.

### 3. Conclusion

For the reasons set forth, the Court recommends that Dr. Songer's motion for summary judgment on the Third Cause of Action be **GRANTED.**

### b. Fourth Cause of Action

In the Fourth Cause of Action, Provencio Jr. asserts that Dr. Songer may be held liable for failing to provide Provencio with sufficient medical care before he transferred him to the care of the ambulance personnel. However, it is undisputed that Dr. Songer was not on duty at the time of the incident and did not provide any treatment to Provencio. Moreover, Plaintiff offers no argument to the contrary and, in fact, fails to make any argument related to the Fourth Cause of Action. Therefore, the Court recommends that Dr. Songer's motion for summary judgment on the Fourth Cause of Action be **GRANTED.**

### c. Fifth Cause of Action

The Fifth Cause of Action alleges that Provencio Jr. has suffered a deprivation of his Fourteenth Amendment right to the familial relationship with his father, Provencio. In support of this assertion, he relies upon the allegations of the raised in the Third and Fourth Causes of Action. For the reasons set forth above in the discussions related to these causes of action, the Court recommends that Dr. Songer's motion for summary judgment on the Fifth Cause of Action be **GRANTED**.

### d. Sixth Cause of Action

---

[9] However, the Court accepts the statements of counsel for Nancy Mendoza at oral argument, that Provencio did not display these symptoms immediately due to his "slow bleed."

The Sixth Cause of Action alleges that Plaintiffs Nancy Mendoza and Johnny Gallegos have suffered a deprivation of their Fourteenth Amendment right to their familial relationship with Provencio. They rely upon the allegations raised in the Third and Fourth Causes of Action. For the reasons set forth above in the discussions related to these causes of action, the Court recommends that Dr. Songer's motion for summary judgment on the Sixth Cause of Action be **GRANTED.**

## RECOMMENDATION

Based on the foregoing, the Court recommends,

1. That the motion for summary judgment on the Third, Fourth, Fifth and Sixth Cause of Action be **GRANTED**; and

2. Because this disposes of all causes of action related to Dr. Songer, that judgment be entered in Dr. Songer's favor as to the entire matter.

These Findings and Recommendations are submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within fourteen days after being served with a copy, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be filed within fourteen days after service of the objections. The District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). Failure to file objections within the specified time may waive the right to appeal the District Judge's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **June 16, 2010**                    /s/ Jennifer L. Thurston
UNITED STATES MAGISTRATE JUDGE