1
2
3
4
5
6
7
8                    **IN THE UNITED STATES DISTRICT COURT**

9                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   DANIEL PROVENCIO, JR., personally   )   CASE NO. 1:07-cv-00069-AWI- JLT
     and as successor in interest to DANIEL   )
12   PROVENCIO, deceased, by his   )
     guardian ad litem, Maria Lucero, et al.,   )   FINDINGS AND RECOMMENDATION
13                                       )   GRANTING IN PART AND DENYING IN PART
          Plaintiffs,                    )   MOTION FOR SUMMARY JUDGMENT FILED
14                                       )   BY DEFENDANTS VASQUEZ, PALMER,
          v.                             )   HICKS, DRUGICH AND PAREDES
15                                       )
     PATRICIA L. VAZQUEZ, et al.,        )   (Doc. 173)
16                                       )
          Defendants.                    )
17                                       )
                                         )
18   _____ )

19        Pending before the Court is the motion for summary judgment filed purportedly by Defendants

20   Vasquez, Palmer, Lawless, Hicks, Drugich, Short, Ramos and Paredes (Doc. 173) The Court notes,

21   however, that Short, Lawless and Ramos were granted summary judgment by the Court on March 1,

22   2010 (Doc 162) upon the agreement of Plaintiffs and they were not named in the Fifth Amended

23   Complaint ("FAC").  Thus, the Court will proceed only as to the remaining defendants.

24        Plaintiffs have opposed the motion for summary judgment.  (Doc. 181)  On June 9, 2010, the

25   Court heard argument on the matter and, at the conclusion of argument, took the matter under

26   submission.

27   **I.      Undisputed Factual Background**

28        On January 16, 2005, Daniel Provencio ("Provencio") was an inmate at Wasco State Prison

                                         1

("WSP").  (FAC at 7) Provencio was housed in Facility D which held the inmates who were the highest security risks due to the nature of the crime for which they were sent to prison or due to their conduct in prison.  (UMF[1] 3)  During a prison disturbance on that date, Provencio was shot in the head with a rubber projectile from a 40mm launcher operated by correctional officer, Matthew Palmer.  (FAC at 7)  After the shooting, defendant Paredes and other officers arrived at Facility D.  (UMF 23) Paredes ordered an officer to use pepper spray on Provencio, who was refusing to comply with orders to "get down" and was actively attempting to incite the other inmates. (UMF 27) Once sprayed, Provencio was handcuffed and taken from the scene.  (UMF 29) He was placed on a gurney for transport to the medical treatment area of WSP.  (UMF 37)  Because Provencio was spitting at the personnel, he was placed in a spit mask to prevent his bodily fluids from reaching the staff members. (UMF 38)

At the medical treatment area, Paredes placed Provencio placed in leg restraints because Provencio continued to be combative and attempted to kick the staff.  (UMF46) Every time the medical professionals, Hicks and Drugich, removed the spit mask to assess the injury caused by the rubber projectile, he spat at them.  (UMF 40) Hicks explained to Provencio the need to conduct a medical examination and obtained Provencio's agreement not to spit at them but, as soon as the mask was removed, Provencio spat at them. (UMF 40)  Virtually the entire time that Provencio was present at the medical treatment area, before the doctor arrived, he continued to be combative and struggled to free himself from the restraints.  (UMF 41, UMF 47) This required Paredes and another officer, to place their hands on Provencio's shoulder areas to hold him onto the gurney.  (UMF 46)  Shortly thereafter, Provencio slipped into a coma and was transferred to an area hospital where he later died.  (FAC at 8)

Defendant Vasquez was the warden at WSP.  (UMF 32) She was not present at the time of the incident.  (UMF 32, UMF 53) Although she had authority over WSP's budget, the type of training that the correctional officer received and the type of weapons that they used were determined at the centralized headquarters from the California Department of Correction and Rehabilitation.  (UMFs 62-66) Warden Vasquez's responsibility required her only to ensure that the training that the CDCR determined should be given was, in fact, given.  (UMF 62)

---

[1]"UMF" refers to the Undisputed Material Facts.

1    For the reasons set forth below, the Court recommends that the motions for summary judgment

2    be **GRANTED IN PART AND DENIED IN PART.**

3    **II.    Summary Judgment Standard**

4    Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials

5    on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant

6    is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party moving for summary judgment

7    "always bears the initial responsibility of informing the district court of the basis for its motion, and

8    identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on

9    file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of

10   material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

11   Where the moving party will have the burden of proof on an issue at trial, he must "affirmatively

12   demonstrate that no reasonable trier of fact could find other than for the moving party." Soremekun v.

13   Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007); see also S. Cal. Gas Co. v. City of Santa Ana,

14   336 F.3d 885, 888 (9th Cir. 2003) (noting that a party moving for summary judgment on a claim as to

15   which it will have the burden at trial "must establish beyond controversy every essential element" of the

16   claim) (internal quotation marks omitted). As to an issue which the opposing party will have the burden

17   of proof, the moving party "can prevail merely by pointing out that there is an absence of evidence to

18   support the nonmoving party's case." Soremekun, 509 F.3d at 984.

19   When a motion for summary judgment is properly made and supported, the opposing party

20   cannot defeat the motion by resting upon the allegations or denials of its own pleading but "must set

21   forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine

22   issue for trial.'" Soremekun, 509 F.3d at 984 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

23   250 (1986)). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise

24   genuine issues of fact and defeat summary judgment." Id.

25   To defeat a motion for summary judgment, the opposing party must show there exists a genuine

26   dispute of material fact. A fact is "material" if it "might affect the outcome of the suit under the

27   governing law." Anderson, 477 U.S. at 248. "[S]ummary judgment will not lie if [a] dispute about a

28   material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for

1   the nonmoving party." Id. at 248.

2       In resolving the summary judgment motion, the court examines the pleadings, depositions,

3   answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c). The

4   evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable

5   inferences that may be drawn from the facts placed before the court must be drawn in favor of the

6   opposing party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1987) (citing

7   United States v. Diebold, Inc., 369 U.S. 654, 655, (1962) (per curiam). Nevertheless, unreasonable

8   inferences may not be drawn, and it is the opposing party's obligation to produce a factual predicate

9   from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F.Supp. 1224, 1244-45

10  (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

11      **A.      Plaintiffs have failed to supply evidence to support many of their claims of dispute**

12      The party opposing a motion for summary judgment cannot "'rest upon the mere allegations or

13  denials of the adverse party's pleading' but must instead produce evidence that 'sets forth specific facts

14  showing that there is a genuine issue for trial.'" Estate of Tucker v. Interscope Records, 515 F.3d 1019,

15  1030 (9th Cir. 2008) (quoting Fed. R. Civ. Pro. 56(e)).  If the opposing party fails to produce evidence

16  sufficient to create a genuine  issue of material fact, the moving party is entitled to summary judgment.

17  Nissan Fire & Marine Ins. Co. V. Fritz Companies, 210 F.3d 1099, 1103 (9th Cir. 2000).  Similarly,

18  Local Rule 260 provides,

19      Any party opposing a motion for summary judgment or summary adjudication shall
        reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts
20      that are undisputed and deny those that are disputed, **including with each denial a
        citation to the particular portions of any pleading, affidavit, deposition,
21      interrogatory answer, admission, or other document relied upon in support of that
        denial**. The opposing party may also file a concise "Statement of Disputed Facts," and
22      the source thereof in the record, of all additional material facts as to which there is a
        genuine issue precluding summary judgment or adjudication. **The opposing party shall
23      be responsible for the filing of all evidentiary documents cited in the opposing
        papers.** See L.R. 133(j). If a need for discovery is asserted as a basis for denial of the
24      motion, the party opposing the motion shall provide a specification of the particular facts
        on which discovery is to be had or the issues on which discovery is necessary.

25

26  (Emphasis added.)  In Burch v. Regents of the Univ. of Cal., 433 F.Supp.2d 1110, 1126 (E.D. Cal.

27  2006), the Court held,

28      Plaintiff cannot successfully oppose defendants' motion for summary judgment with

4

1   mere suspicions and undocumented arguments. See S.A. Empresa de Viacao Aerea Rio
2   Grandense v. Walter Kidde & Co., Inc., 690 F.2d 1235, 1238 (9th Cir. 1982) (holding
    that "a party cannot manufacture a genuine issue of material fact merely by making
3   assertions in its legal memoranda". He must instead identify portions of the record that
    call into question the material facts of this case. In the absence of evidentiary support, the
4   court is not obligated to "search the entire record to establish that it is bereft of a genuine
    issue of material fact." Street v. J.C. Bradford & Co., 886 F.2d 1472, 1480 (6th Cir.
5   1989); see also Newman v. Checkrite Cal., Inc., 912 F. Supp. 1354, 1377 n. 34 (E.D. Cal.
    1995) ("On summary judgment, where our Local Rule 260 requires the parties to cite to
6   [the] evidentiary record, it is not the court's job to go sifting through depositions looking
    for evidence.").

7        Despite Plaintiffs' obligation to provide the evidence upon which they rely, they fail to supply

8   the Court with their Exhibits 17 through 24. As best as the Court can discern, this includes the recorded

9   statement of Thomas Ellis, Adam Gomez, Nick Gongora and Matthew Hacker and both recorded

10  statements of Gary Flippo and David Hicks.[2] Given this failure, the Court disregards any reference to

11  this evidence, except to the extent that it is supplied by Defendants.

12        Likewise, the Court finds that, as to many alleged disputes of fact, the Plaintiffs have failed to

13  support that a dispute exists in many of their responses to the Facts set forth in the separate statement

14  of undisputed facts.  The Court finds that Plaintiffs have failed to cite to *any* evidence or have failed to

15  cite to evidence that supports that a dispute exists.  Upon these bases, the Court finds the following facts

16  are undisputed despite the Plaintiffs' claim that a dispute of fact exists: UMF 19, 20, 22 (except to the

17  extent that there *is* a dispute about whether any of the inmates referred to the Chino incident), 24, 26,

18  28, 30, 32, 33, 36, 38, 41, 42, 43, 44, 45, 46, 47,  61, 62, 65, 67, 70, 73, 75 and 76.

19  **III.    Discussion**

20        **A.    Legal Standards**

21  _____

22        [2]In its March 1, 2010 order, the Court granted permission to the parties to rely upon exhibits previously filed in
    opposition to the earlier filed motion for summary judgment.  However, if they chose to do this, the Court ordered them to
    cite to the docket number and exhibit number of evidence already on file." (Doc 163 at 6) With their current opposition,
23  Plaintiffs filed some evidence again but they did not file all of the evidence upon which they rely.  Thus, apparently, they
    intended to rely upon some of the evidence previously filed. Nevertheless, Plaintiffs failed to comply with the Court's order
24  to cite to the docket number and exhibit number for these previously filed exhibits.  Importantly, when they filed their
    opposition to the previous motion for summary judgment, they did not provide all of their evidence at that time either.  Had
25  the Plaintiffs complied with the March 1, 2010 order and made proper citations, they would have discovered that Exhibits
    17 - 24 were never filed.
26        In any event, their failure to cite to the proper docket numbers associated with their previously filed evidence along
    with their failure to make proper docket entries (now corrected by the Court) that reflect accurately the documents filed,
27  placed a significant burden on the Court to search out their evidence among the hundreds of documents filed in this case.
    Although it was not required to do so, the Court undertook this task and made its best effort to locate the evidence cited but,
28  as noted above, it is has been unable to locate any of Exhibits 17-24 among the documents filed.

1      **1.      Section 1983 Actions**

2      The Civil Rights Act under which this action was filed provides,

3      Every person who, under color of [state law] . . . subjects, or causes to be subjected, any
       citizen of the United States. . . to the deprivation of any rights, privileges, or immunities
4      secured by the Constitution . . . shall be liable to the party injured in an action at law, suit
       in equity, or other proper proceeding for redress.
5

6      42 U.S.C. § 1983. "Section 1983 . . . creates a cause of action for violations of the federal Constitution

7      and laws." Sweaney v. Ada County, Idaho, 119 F.3d 1385, 1391 (9th Cir. 1997) (internal quotations

8      omitted).  The statute plainly requires that there be an actual connection or link between the actions of

9      the defendants and the deprivation alleged to have been suffered by Plaintiffs. See Monell v. Department

10     of Social Services, 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976). The Ninth Circuit has

11     held that "[a] person 'subjects' another to the deprivation of a constitutional right, within the meaning

12     of section 1983, if he does an affirmative act, participates in another's affirmative acts or omits to

13     perform an act which he is legally required to do that causes the deprivation of which complaint is

14     made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

15     **2.      Eighth Amendment Claims**

16     When a prison official uses excessive force against a prisoner, he violates the inmate's Eighth

17     Amendment right to be free from cruel and unusual punishment." Clement v. Gomez, 298 F.3d 898, 903

18     (9th Cir.2002). "Force does not amount to a constitutional violation in this respect if it is applied in a

19     good faith effort to restore discipline and order and not 'maliciously and sadistically for the very purpose

20     of causing harm.'" Id. quoting Whitley v. Albers, 475 U.S. 312, 320-21 (1986)). To make this

21     determination, the Court may evaluate "the need for application of force, the relationship between that

22     need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' . . . 'any

23     efforts made to temper the severity of a forceful response'" and the extent of any injury inflicted. Hudson

24     v. McMillian, 503 U.S. 1, 7 (1992).

25     **B.      First Cause of Action for Excessive Force**

26     **1.      There is a question of fact as to whether the force used by Palmer was**

27     **designed to restore discipline**

28     The evidence presented by the parties varies greatly.  When taken most favorably to the

1   Plaintiffs, the evidence demonstrates that there is a genuine dispute of material fact as to the action of

2   defendant Palmer.[3]  For example, when the inmates were ordered to "get down," the evidence supports

3   an inference that there was a period of confusion by the inmates surrounding whether the floor officer,

4   Blansett, wanted all of the inmates to get down, or only the two who were involved in the altercation.[4]

5   Although it is undisputed that Provencio did not get down immediately, Plaintiffs' evidence indicates

6   that he was not acting in an aggressive manner toward Blansett or anyone else at that time.  Instead, he

7   was complying with the order, albeit more slowly than others, because he was delayed by his attempt

8   to break up the fight that gave rise to the order to "get down" and due to his inquiring of Blansett

9   whether everyone was required to get down.  Likewise, the evidence demonstrates that Provencio was

10  intoxicated and displayed symptoms of intoxication throughout the meal period leading up to the

11  incident and there is no indication that Palmer was unaware of his condition.  Drunkenness could also

12  account for Provencio's delayed reaction time.

13          In any event, statements from the inmates indicate that Provencio *was* complying with the

14  order to get down.  Inmate Prieto reported that the shot was fired as Provencio was going down onto

15  his knees.  (Doc 122, Ex 43 at 5:18-25, 6:19-22)  Inmate Reynaldo Latre asserted that Provencio had

16  gotten down at the time he was shot.  The inmate reported, "They told him to get down.  He had got

17  down, but I guess like his shoulder was up a little but and he was looking behind him, I guess to see

18  if somebody was - - you know the type of look when you think somebody is going to attack you or

19  something." (Doc 122, Ex 30 at 5)  He reported also, "But I guess the dude didn't get down quick

20  enough or his body wasn't all the way down or whatever.  He wasn't in the exact prone position.  It

21  looked like he was up on his elbows a little bit . . . He was on his elbows and he was trying to make

22  sure his surrounding - - he didn't want nobody to do nothing to him.  You could tell by the way he

23  was looking.  But he was laying down flat but was on his elbows."  (Doc 122, Ex. 30 at 9-10)

24  _____

25      [3]The defendants argue that the recorded statements given by the inmates soon after this event are "unreliable."  In
    essence, the defendants claim that the inmates are not credible.  If the Court was entitled to determine credibility on a motion
26  for summary judgment, this argument might be persuasive.  Moreover, the defendants' arguments that the inmates were not
    able to adequately perceive what they reported to have observedseems to be a question for the jury given that they *say* that
27  they witnessed the event.

28      [4]It is undisputed that upon Blansett issuing the order to "get down," the altercation between these other two inmates
    ended and they went down onto the floor. (Blansett Dec at ¶¶ 3-4; Palmer Dec ¶ 10)

1   Likewise inmate Leivas reported that Provencio was shot because "he was too slow to get down so

2   they shot him."  (Doc 122, Ex 33 at 4:17-24) He reported that one of the sergeants on the scene

3   admitted that Provencio was shot because he got down too slowly because he was "too fucking

4   stoned." Id.  Also, he reported that the shot was fired immediately after the order to "get down." Id.

5   at 10:10-16.

6       Notably, all of the inmate statements cited by Plaintiffs deny that the inmates on the floor

7   were urging Provencio to "get that motherfucker like they did in Chino."  Thus, Palmer's claims that

8   Provencio was not complying with orders to "get down" and was being urged to violence by the

9   other inmates and the accompanying implication that violence by Provencio was imminent, are

10  contradicted and indicate that Provencio was merely talking to Blansett.  The evidence submitted by

11  Plaintiff, therefore, creates a material question of fact.  Although Palmer argues that these disputes of

12  fact are irrelevant to the determination as to whether Palmer was entitled to fire the launcher at

13  Provencio–seemingly arguing that *anytime* an inmate fails to immediately comply with an officer's

14  order, an officer may use force *even after* compliance has been achieved[5]–the Court disagrees.

15      In evaluating Palmer's use of force, the Court is required to follow the test set forth in

16  Hudson.  First, the Court must consider whether there was a need to use force.  The evidence taken

17  most favorably to the Plaintiffs supports an inference that the voice commands were effective in

18  controlling the inmates and, although Provencio complied more slowly, he *had* complied at the time

19  that Palmer fired the launcher.

20      Second, the Court is required to evaluate the amount of force used when compared to the

21  need for it.  The Plaintiffs' evidence demonstrates that a question of fact exists as to whether

22  Provencio's compliance, albeit slow compliance, with Blansett's order before the shot was fired,

23  justified the amount of force used by Palmer.  Also, several of the inmate statements cited by

24  Plaintiffs indicate that Palmer was aiming the launcher directly at Provencio's head.  Rather than

25

26      [5]The Court does not disagree that the use of force to address insubordination that threatens the internal security of
    the facility may be warranted.  Soto v. Adams, 2008 US Dist. LEXIS 14345 at 23 (E.D. Cal. 2008).  However, the evidence
27  presented here indicates that the force was used *after* the insubordination ended.  In LaLonde v. County of Riverside, 204
    F.3d 947, 961 (9th Cir. 2000), the Court held that using force on a person who had "fully surrendered" was analogous to a
28  situation where an officer "sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control."
    Thus, according to LaLonde, using force after compliance has been achieved is constitutionally unsound.

8

1    demonstrating that Palmer tempered the amount of force and tailored the use of force to the

2    circumstances before him, this creates the inference that Palmer's motivation was malicious rather

3    than taken in good faith to restore order. Finally, for these same reasons, there remains a question of

4    fact as to threat reasonably perceived by Palmer. Thus, the Court concludes that there is a reliable

5    inference raised by the Plaintiffs that Palmer acted with wantonness in the use of the launcher.

6    Whitely, 475 U.S. at 322.

7         Jeffers v. Gomez, 267 F.3d 895 (9th Cir. 2001) does not allow a different outcome.  In

8    Jeffers,  the plaintiff was shot by a errant bullet when prison officials were attempting to quell "one

9    of the largest disturbances" that the Department of Corrections had experienced in its history.  Id. at

10   901.  Between 150 and 200 inmates were involved in the prison yard, race riot and many were armed

11   with makeshift stabbing weapons. Id. at 901-902.  When the defendants fired their weapons at the

12   inmates, it was done to prevent serious injury or death of others and was done while the fray was

13   ongoing.  Id. In fact, Jeffers was shot mistakenly when one of the defendants fired at the inmate who

14   was attempting to stab Jeffers with a five-to-six inch nail that had been fashioned onto a plastic

15   handle.  Id. at 902.

16        Here, the evidence presented by Plaintiffs demonstrate that Palmer shot Provencio after he

17   had complied with orders to "get down."  Coupled with  the evidence presented that Palmer had a

18   reputation among the inmates "for busting on" them (Doc 122, Ex 12 (Coleman Stmt.) at 7:7-12),

19   unlike in Jeffers, the inference presented here is that Palmer shot Provencio for reasons other than in

20   a good faith attempt to restore discipline.  For these reasons, it is recommended that Palmer's motion

21   for summary judgment be **DENIED.**

22              **2.    The Court declines to consider whether Palmer is entitled to the**

23                   **protections of qualified immunity.**

24        In the moving papers, the parties state,

25        Note: This motion is made upon the ground that these defendants are entitled to
         judgment as a matter of law *on the merits*, i.e there are no triable issues of fact as to
26       any violation of Provencio's Eighth or Fourteenth Amendment rights by any of said
         defendants. This motion is not being brought on the defense of "qualified immunity."

27

28   (Doc 173 at 9) Therefore, the parties did not provide notice that judgment would be sought based

1   upon the defense of qualified immunity, did not brief this issue and expressly assured the Plaintiffs

2   that they did not seek judgment on this basis.  Nevertheless, in their Reply, Palmer asserts,

3          To the extent this Court concludes that there is a triable issue of material fact as to
       how exactly the incident unfolded on January 16, 2005, Sgt. Palmer seeks qualified
4          immunity because a reasonable officer in his situation could perceive that an inmate
       refusing to obey commands to "get down" posed a threat of safety to a floor officer
5          alone among nearly forty unrestrained inmates.

6   Defendants make no other argument nor offer any analysis upon this issue.  Given these

7   circumstances, the Court declines to consider this contention raised on reply and in direct

8   contradiction to the position taken in the moving papers.  Glenn K. Jackson Inc. v. Roe, 273 F.3d

9   1192, 1202 (9th Cir. 2001)(court has discretion to consider issues raised in a reply brief).

10                   **3.       There is no dispute of fact that Paredes' did not violate the Eighth**

11                        **Amendment by ordering the use of the pepper spray**

12          There is no dispute of fact that when Paredes ordered Adams to use his pepper spray on

13   Provencio, Provencio was not down on the ground.  (UMF 24)  Paredes had repeatedly ordered him

14   to "get down" but Provencio refused. (UMF 24-27) Provencio was on his feet, inciting the other

15   inmates who were beginning to rise from their prone positions and who had begun shouting at the

16   officers.  (UMF 26) Provencio was refusing orders to "get down" despite that a fellow inmate was

17   attempting to pull him to the ground. (UMF 24)  By this time, the confrontation had escalated from a

18   "Code 1" event to a "Code 2" incident.  The guards were outnumbered by the unrestrained inmates.

19   (UMF 26)  In response, to this situation, Paredes ordered a subordinate officer to discharge pepper

20   spray at Provencio.  This does not amount to a constitutional violation.

21          In Clement v. Gomez 298 F.3d 898, 901 (9th Cir. 2002), officials were faced with a violent

22   fight inside a cell at Pelican Bay State Prison. Inmates failed to comply with officers' orders to stop

23   and to "get down on the floor."  Id.  At least two, two-to-five second bursts of pepper spray were

24   deployed into the cell.  Id. at 901-902.  The spray drifted into neighboring cells causing discomfort

25   and breathing difficulties. Id. at 902.  Prison officials attempted to mitigate the effects of the spray by

26   using fans which caused the spray to spread to other cells.  Id.  Not until four hours later did prison

27   officials begin escorting inmates to their regularly scheduled showers.  Id.  On these facts, Clement

28   decided that the use of the pepper spray was not a violation of the Eighth Amendment.  Id. at 903-

1    904.  The Court held,

2        [T]he inmates have failed to establish that the officials applied the pepper spray
3        maliciously and sadistically for the very purpose of causing harm. The prison officials
         administering the spray claim that the second application was dispensed because the
4        bodies of the fighting inmates had blocked the initial spray. In fact, the defendants
         claim that some of the pepper spray ricocheted back onto them after the first shot. The
5        final spray was administered immediately thereafter. Even if the allegation of the
         neighboring inmates is true, viz, that the final spray was dispensed after the sounds of
6        coughing and gagging were heard from the cell, this allegation alone does not lead to
         the inference that the official used the pepper spray 'maliciously and sadistically for
7        the very purpose of causing harm."

8    Id.  Therefore, Clement instructs that the use of pepper spray to address inmates who fail to comply

9    with instructions to "get down" and who threaten prison security passes constitutional muster.

10        Nevertheless, Plaintiffs seem to argue that, in light of Provencio's open wound, the officers

11   should not have used the pepper spray because of the extra pain that they say he would have suffered.

12   They submit no evidence that the officers had any awareness of extra pain being caused if, indeed

13   this caused extra pain, nor is there any evidence from any source that Provencio said or did anything

14   that could raise an inference that because of the open wound, he suffered different or greater pain.

15   Moreover, given their repeated arguments as to Provencio's extensive bleeding, this failure is

16   significant because another, equally likely situation is that the profuse bleeding flushed the spray

17   from the wound.  However, without evidence, the Court can draw no conclusion in this regard.

18        Nonetheless, the Constitution does not require officers to use only those pain compliance

19   tools that prisoners prefer.  Instead, the official's judgment as to the tool to use is entitled to

20   deference. Hudson at 6.  The Eighth Amendment does not entitle Plaintiffs to second guess the

21   method of force used here to restore order from the disorder that Provencio's actions caused.

22   Instead, the question posed by the Eighth Amendment is whether the force was applied in a

23   good-faith effort to restore discipline, and the facts clearly demonstrate that it was.

24        Further, the fact that Provencio felt pain from the use of the pepper spray and experienced

25   breathing difficulties is not sufficient to raise a triable issue as to whether the force used was such to

26   constitute a constitutional violation.  If pepper spray was benign and caused no pain, it would be

27   ineffective and would serve no purpose as tool to maintain or restore discipline.  Because the

28   purpose of the OC spray is to cause a painful burning sensation, this is not evidence that the force

11

1   used was unlawful.  In short, there is no evidence presented that would support an inference that the

2   use of the pepper spray was malicious and sadistic.

3          **4.     The failure by Palmer, Paredes, Drugich and Hicks to flush the pepper**

4                  **spray from Provencio's face was not a violation of the Eighth**

5                  **Amendment**

6          Plaintiffs seem to contend that the failure by Paredes, Drugich and Hicks[6] to flush

7   Provencio's face after he was sprayed with pepper spray was a separate violation of the Eighth

8   Amendment.  (Response to UMF 27) They argue the leg restraints and handcuffs Provencio wore

9   caused him to be under the officers' control which provided them "an opportunity to decontaminate

10  Provencio."  This ignores the totality of the situation.

11         At the medical treatment area, despite the use of the restraints, Provencio thrashed around,

12  attempted to get out of the handcuffs and cussed at staff. (UMF 40) When Hicks removed the spit

13  mask and began to clean the wound, Provencio spat at him.  (UMF 40, response to UMF 41) For the

14  length of time that he remained in the treatment area until the time he lost consciousness, Provenio

15  remained combative. (UMF 47).

16         In Clement v. Gomez, 298 F.3d at 901, the Court reversed the grant of summary judgment as

17  to whether the officials were deliberately indifferent to the inmate's medical care by failing to

18  provide quick decontamination from the pepper spray that was deployed.  However, the Court

19  refused to draw a bright line test for the amount of time that may pass before prison officials must

20  provide decontamination.  Id. at 904.  The Court held that only purposeful refusal to decontaminate

21  the inmate, done with the intention to cause the inmate to suffer the known effects of the pepper

22  spray, constitutes deliberate indifference for Eighth Amendment analysis.  Id.  Moreover, the Court

23  held that security restraints were relevant factors in evaluating whether the failure to decontaminate

24  constituted a constitutional violation.  Id. at 905 n. 4. The Court observed, "These competing

25  tensions – the prisoners' need for medical attention and the government's need to maintain order and

26  discipline – may be important to the resolution of whether the officials had the requisite subjective

27

28         [6]Although the FAC alleges that Palmer should be held liable on this basis also, Plaintiffs admit in their opposition
    that he should *not* be held liable for failing to flush the pepper spray from Provencio's face.

1   intent."

2       Moreover, the failure to treat the effects of pepper spray suffered by an inmate for over an

3   hour has been determined not to be a constitutional violation.  Gibson v. Woodford, 2010 U.S. Dist.

4   LEXIS 12979, 11-12 (E.D. Cal. Feb. 12, 2010) The Court held, "On the facts of this case, this

5   relatively brief delay did not amount to deliberate indifference . . . Similar or longer delays are often

6   encountered in emergency rooms across the country under comparable circumstances." Id.

7       Unlike in Clement, here it was Provencio's action that prevented him from having his face

8   flushed with water.  Whenever the spit mask was removed, he attempted to spit at the personnel

9   nearby. Given that blood was present in the fluid that he spat, the health danger posed by his spitting

10  was substantial and prevented him from receiving medical care for the effects of the pepper spray

11  and the head injury.  Although Plaintiffs characterize Provencio spitting as his attempt to clear his

12  mouth of blood, rather than as acts of aggression and noncompliance, this inference is not supported

13  by the evidence.  Instead, this position is contradicted by the evidence that Provencio fought with the

14  officers, kicked his legs and prevented attempts at medical intervention nearly until the moment he

15  became unconscious. Given this situation, the Court finds that there is no factual dispute that would

16  demonstrate that Palmer, Paredes, Drugich or Hicks refused to flush the pepper spray from

17  Provencio's face for the purpose of causing him additional pain.  Thus, there is no violation of the

18  Eighth Amendment on this basis.

19          **5.      Paredes use of physical force did not violate the Eighth Amendment**

20      As noted above, at the medical treatment area, Provencio thrashed around, attempted to get

21  out of the handcuffs and cursed and kicked at staff members. (UMF 40, 41, 45, 46, 47) When Hicks

22  removed the spit mask and began to clean the wound, Provencio spat at him.  (UMF 40, 41, response

23  to UMF 41) For the length of time that he remained in the treatment area until the time he lost

24  consciousness, Provencio remained combative. (UMF 40, 41, 45, 46, 47).  Due to this, Paredes

25  placed Provencio in leg restraints and, when he continued to struggle, Paredes and another officer

26  held Provencio down by his chest and arms for a short period until he agreed to comply with

27  instructions to stop resisting and agreed to stop struggling. (UMF 46, 47) The reason that Paredes

28  used the restraints and held him down was to discourage Provencio's combativeness and to prevent

13

1  Provencio from causing himself further injury. (UMF 46)  Given this factual situation, there is no

2  triable dispute of fact that there was a need to use force on Provencio to prevent him from harming

3  others and further injuring himself and the amount of force used limited and was tailored to achieve

4  this objective. <u>Hudson</u>, 503 U.S. at 7.

5      Plaintiffs claim, without citation to any evidence or expert opinion, that because it was

6  reported that Paredes said "shoot him again" while the event was still occurring, that somehow this

7  means that Paredes' actions in the treatment area were malicious and sadistic.  However, the fact that

8  Paredes felt that the situation warranted the use of the launcher a second time in the day room where

9  the disturbance occurred, tells the Court nothing about Paredes' actions in the medical treatment

10 area.  Plaintiffs offer no evidence to counter that Provencio was combative, that he kicked at the

11 personnel, that he spat at them and that he actively resisted attempts to provide him medical care.

12 Instead, Plaintiffs offer only speculation without regard for the requirements of Rule 54 and Local

13 Rule 260.  This is insufficient.  Instead, the Plaintiffs "must do more than simply show that there is

14 some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>

15 <u>Corp.</u>, 475 U.S. at 586.  Therefore, the Court cannot find that there is a genuine dispute of material

16 fact as that Paredes' efforts to counter Provencio's combative  conduct was done maliciously or

17 sadistically.

18              **6.      Conclusion**

19      For the reasons stated, it is recommended that Palmer's motion for summary judgment on the

20 First Cause of Action be **DENIED**.  It is recommended that the motions of defendants Paredes,

21 Drugich and Hicks on the First Cause of Action be **GRANTED.**

22          **C.      Second Cause of Action against defendant Vasquez**

23      In the second cause of action, Plaintiffs contend that Vasquez should be held liable because

24 she failed to properly train Palmer to use the launcher and failed to train other officers not to use

25 pepper spray on inmates with head injuries and about their obligation to flush the spray from the

26 inmate's face after its use, that she failed to take action when she learned that inmates were being

27 struck with the launcher projectiles in the upper body and she failed to establish a policy that

28 required that all launchers to be properly sighted before their use.

1    A supervisor's failure to train subordinates can give rise to individual liability under Section

2    1983 where the supervisor's failure amounts to deliberate indifference to the rights of persons with

3    whom the employees are likely to come into contact. See Canell v. Lightner, 143 F.3d 1210, 1213-14

4    (9th Cir. 1998) (to prevail on claim that supervisor violated plaintiff's constitutional rights by failing

5    properly to train subordinate, plaintiff must show that failure amounted to deliberate indifference).

6    For liability to attach in this circumstance, Plaintiffs must show that the training of the subordinate

7    was inadequate and that the inadequacy of the training was the result of a deliberate or conscious

8    choice on the part of Vasquez. Id. at 1214. Also, the identified training deficiency must be causally

9    connected to the ultimate injury. City of Canton v. Harris, 489 U.S. 378, 391 (1989). In other words,

10    to impose liability, Plaintiffs are required to show that the inadequate training actually caused the

11    constitutional violation and that the violation would have been avoided had the employees been

12    properly trained. Id. at 389-91; Lee v. City of Los Angeles, 250 F.3d 668, 681 (9th Cir. 2001)

13    (citations and internal quotations omitted).

14           **i.**     **There is no evidence that Vasquez made a deliberate decision to provide**

15                      **inadequate training**

16    The evidence shows that Vasquez did not determine the force tools that were provided to the

17    correctional officers and did not determine the training they received about how to use these tools.

18    (UMF 61, 63, 64) Instead, these decisions were made by the CDCR's training division located in

19    Sacramento. (UMF 61) This body made these determinations to ensure uniformity in the tools and

20    training provided to the officers at the various prisons operated by the CDCR in the state. Id.

21    Moreover, the CDCR determined the amount of WSP's budget that had to be spent on the training

22    that the CDCR determined had to be provided. (UMF 65) Vasquez's role related to training was

23    limited to ensuring that each officer received the training that the CDCR required.[7] (UMF 62, 65,

24    66) She satisfied this duty by having managers at WSP who carried the day-to-day responsibility of

---

[7]Plaintiffs interpret Vasquez's testimony, in which she admits that it was her obligation to ensure that appropriate training was given to each officer so that inmates were not improperly treated, to mean that she had the ability and the authority to decide that the training dictated by the CDCR was not appropriate. However, this interpretation is contrary to the totality of the evidence that she did not have this ability or authority. The inference from this testimony, when taken in context, was that Vasquez had the obligation to provide all of the training that the CDCR had determined, already, was the appropriate training.

1   ensuring that the training required by the CDCR was given to WSP personnel.  (Response to UMF

2   65, 67, 68, 69, 70)

3          For example, the WSP Armory Sergeant was duty-bound to provide the CDCR specified

4   training related to the use and sighting of the launcher at issue and to maintain the records of any

5   sighting adjustments made to the weapons.  (UMF 70, 71, 72) The WSP Armory Sergeant was

6   responsible also for providing the CDCR specified training regarding the proper use of pepper spray

7   and the methods of decontamination once the spray was used.  (UMF 73)  Finally, Vasquez asserts

8   that she did not become aware, before the incident with Provencio, that there was a deficiency in the

9   training program required by the CDCR.  (UMF 76)  Given all this evidence, Vasquez has met her

10  burden of demonstrating that she did not make a deliberate choice in the training given that caused

11  the injuries alleged in this case.

12         Nevertheless, Plaintiffs assert that Vasquez had control over the WSP budget, except for that

13  portion that the CDCR dictated had to be spent on training, and could have and should have provided

14  additional training on the force tools used by the officers.  It seems clear that in making these

15  arguments, Plaintiffs contend that *different* training should have been provided from that outlined by

16  the CDCR.  However, other than their speculation, they provide no evidence that Vasquez had the

17  authority to deviate from the standardized training that the CDCR determined had to be given to each

18  correctional officer within the CDCR system.  In fact, this is counter to the evidence that the CDCR

19  required *uniformity* in the training given from prison to prison.  (UMF 61)

20         On the other hand, Plaintiffs cite Dr. Ramos' testimony in which he recalled seeing

21  approximately four or five inmates in the medical treatment area between 2001 and 2005, who had

22  been struck by projectiles in the upper body.  They seem to argue that this evidence means that

23  Vasquez was, indeed, aware of a deficiency in the CDCR required training.  However, Plaintiffs

24  offer no evidence related to why these other inmates were struck in the upper body nor any

25  information about how frequently the launcher was used during this time period.  For example, if the

26  launcher was only used four or five times during this period and each time it was aimed at the legs,

27  this evidence would be quite significant.  On the other hand, if it was used four or five hundred times

28  and each time it was aimed at the legs, these four or five incidents would not demonstrate that a

16

1   wrongful pattern existed.  Thus, this scant evidence does not create a triable issue of fact that

2   Vasquez *was* aware of a training deficiency or that she deliberately chose training that she knew

3   would cause a constitutional violation.  Rather than directly contradicting Vasquez's evidence that

4   she was not aware of a training deficiency, it creates an inference only that despite these other

5   incidents, no wrongful pattern existed.  Therefore, the Plaintiffs have failed to demonstrate that there

6   is a genuine triable issue of material fact related to whether Vasquez's actions caused the

7   constitutional deprivation alleged.

8           ii.       **There is no evidence that Vasquez implemented a policy, or**

9                             **deliberately failed to do so, that caused the constitutional**

10                            **deprivation alleged.**

11  Although Vasquez admitted that she reviewed the reports related to investigations of the use

12  of force by WSP officers, she asserts that she was unaware of a pattern of inmates being struck by

13  projectiles in the head or upper body.  (UMF 74) As noted above, Plaintiffs cite Dr. Ramos'

14  testimony related the number of times he had treated other inmates who had been struck by

15  projectiles in the upper body.  In this context, Plaintiffs  seem to argue that this evidence means that

16  Vasquez was, indeed, aware of a pattern of misfired or misused launchers.

17  For the same reasons set forth above, the inference that this means that, in fact, Vasquez was

18  aware that the launchers were misfired or misused, is not a reasonable inference from the minimal

19  evidence provided and it does not counter Vasquez's evidence that no such pattern existed.[8]  Thus,

20  the Court finds that Vasquez did not demonstrate deliberate indifference when she failed to develop

21  a policy requiring the launcher to be sighted in a particular manner or at a particular time.

22          iii.      **The allegations against Vasquez as the Warden of WSP appear to**

23                            **be an attempt to impose respondeat superior liability**

24  There is no respondeat superior liability under 42 U.S.C. §  1983. Palmer v. Sanderson, 9

25  F.3d 1433, 1437-38 (9th Cir. 1993); Monell, 436 U.S. at 691 (the supervisor of someone who

---

27  [8] Likewise, the evidence demonstrates that the policymaking authority was not vested in Vasquez to determine that
28  training should be redeveloped or that sighting adjustments to the launcher needed to be made before it was used.  (UMF 61-66)

allegedly violated a plaintiff's constitutional rights is not made liable for the violation by virtue of that role). "Liability under § 1983 arises only upon a showing of personal participation by the defendant. (Citation.) A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them. There is no respondeat superior liability under § 1983." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989), citation omitted.

Recently, the Supreme Court rejected that a supervisor can be held liable for his mere "knowledge and acquiescence" in unlawful conduct by his subordinates. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (U.S. 2009).  The Court held,

> . . . respondent believes a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution. We reject this argument. Respondent's conception of "supervisory liability" is inconsistent with his accurate stipulation that petitioners may not be held accountable for the misdeeds of their agents. **In a § 1983 suit or a** *Bivens* **action--where masters do not answer for the torts of their servants--the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.**

Id., emphasis added.  Despite the instruction of Iqbal, Plaintiffs' "failure to train" allegations against Vasquez appear to be an attempt to impose respondeat superior liability.  Their assertion that Vasquez was "captain of the shift" is no more than a negligence claim grounded in the theory that *every* act of wrongdoing by a subordinate stems from a training failure of a superior.  The "captain of the ship" basis for liability has no role in constitutional litigation.  Had Plaintiffs wished to impose liability for negligence, they could have filed a state-law cause of action; they did not do so.

### iv.   Conclusion

For all of the reasons set forth above and because the Court finds that there is no evidence that the acts or omissions by Vasquez caused the damages claimed here, the Court recommends that Vasquez's motion for summary judgment on the Second Cause of Action be **GRANTED.**

### D.   Third Cause of Action for deliberate indifference to a serious medical condition against defendants Vazquez, Hicks and Drugich

Deliberate indifference to a serious medical need violates the Eighth Amendment's proscription against cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97 (1976); Jett v.

18

1   Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). "In the Ninth Circuit, the test for deliberate

2   indifference consists of two parts." Jett, 439 F.3d at 1096. First, the plaintiff must show a serious

3   medical need by demonstrating that failure to treat the prisoner's condition could result in further

4   significant injury or the unnecessary and wanton infliction of pain. Jett, 439 F.3d at 1096; McGuckin

5   v. Smith, 974 F.2d 1050, 1059 (9th Cir.1992), overruled in part on other grounds by WMX

6   Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). "Second, the plaintiff

7   must show the defendant's response to the need was deliberately indifferent." Jett, 439 F.3d at 1096.

8   A prison official is "deliberately indifferent" if he or she knows that a prisoner faces a substantial

9   risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. Farmer v.

10  Brennan, 511 U.S. 825, 837 (1994). In other words, the second prong is satisfied by the plaintiff

11  showing "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and

12  (b) harm caused by the indifference." Jett, 439 F.3d at 1096.

13          "Deliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060

14  (9th Cir. 2004).  It requires "more than ordinary lack of due care for the prisoner's interests or

15  safety." Farmer, 511 U.S. at 835, (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)). The

16  requisite state of mind lies "somewhere between the poles of negligence at one end and purpose or

17  knowledge at the other." Id. at 836.  It may be shown by "the way in which prison physicians provide

18  medical care." McGuckin, 974 F.2d at 1062 (9th Cir. 1992).

19          Under the deliberate indifference standard, prison officials "must not only 'be aware of facts

20  from which the inference could be drawn that a substantial risk of serious harm exists,' but that

21  person 'must also draw the inference.' Farmer, 511 U.S. at 837. 'If a [prison official] should have

22  been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no

23  matter how severe the risk.' Gibson, 290 F.3d at 1188 (citation omitted). [Footnote] This 'subjective

24  approach' focuses only 'on what a defendant's mental attitude actually was.' Farmer, 511 U.S. at

25  839. 'Mere negligence in diagnosing or treating a medical condition, without more, does not violate

26  a prisoner's Eighth Amendment rights. McGuckin, 974 F.2d at 1059 (alteration and citation

27  omitted).'" Toguchi, 391 F.3d at 1057.

28          The thrust of the allegations against Vasquez, Drugich and Hicks in the Third Cause of

1   Action is that they responded to Provencio's serious medical need with deliberate indifference.

2   Farmer, 511 U.S. at 834. In essence, Plaintiffs' claims are twofold: they allege that Vasquez failed to

3   adequately staff and equip the medical facilities at WSP and that Drugich and Hicks failed to provide

4   adequate medical care.

5                    **1.      Provencio had a serious medical need**

6         The existence of an injury that a reasonable doctor would find important and worthy of

7   treatment,  the presence of a medical condition that significantly affects an individual's daily

8   activities, or the existence of chronic and substantial pain are examples of indications that a prisoner

9   has a "serious" need for medical treatment. McGuckin, 974 at 1059-1060 citing Wood v.

10  Housewright, 900 F.2d 1332, 1337-41 (9th Cir.1990); Hunt v. Dental Dept, 865 F.2d 198, 200-01

11  (9th Cir.1989).

12        None of the defendants dispute that Plaintiff died after being struck in the head by a rubber

13  projectile nor do they dispute that the injury he suffered constituted a serious medical need for

14  purposes of Eighth Amendment analysis.  Thus, for purposes of this motion, the Court finds that

15  Provencio suffered a serious medical need.

16                    **2.      The defendants did not act with deliberate indifference to Provensio's**

17                    **serious medical need**

18                         **a.      There is no dispute of fact that demonstrates that Hicks' action**

19                                  **violated the Eighth Amendment**

20        As noted above, when Provencio arrived at the medical treatment area and nearly throughout

21  the time he was there before becoming unconscious, Provencio was alert and responsive as

22  demonstrated by his kicking, struggling and spitting and cursing at staff members. (UMF 40, 41, 43)

23  When the mask was removed, he spat at them.  Although Provencio was placed on his back and side,

24  he consistently returned to his stomach, face down. (Hicks depo at 76)   He addressed staff members

25  by name.  (Doc 173-3 at 9, 16, 18, 19)  Hicks and Drugich repeatedly returned to Provencio's

26  bedside to try to get him to calm down and allow a medical evaluation but he would not do so. Id.

27  Periodically, Hicks asked Provencio his name to determine whether his neurological condition

28  remained unchanged.  (Hicks depo at 52)  Thus, it was Provencio's actions that prevented his receipt

1   of medical care rather than any deliberate indifference on the defendants' part.  Although Dr. Clark

2   opines that Hicks and Drugich should have ignored the spitting and performed the medical

3   assessment[9], he does not explain how the medical staff were to accomplish this task in the face of

4   Provencio's continual thrashing.

5          On the other hand, Hicks did not believe that Provencio had suffered a brain injury and did

6   not believe that his injury was life-threatening.  (Hicks depo at 42, 50)  Notably, Hicks had worked at

7   LA County USC Medical Center in the past and was assigned to neurosurgery while there.

8   (Response to UMF 43)  In his experience, a person with a brain injury is lethargic and not oriented.

9   (Hicks depo at 43-44.)

10         Based upon these facts, at most Plaintiffs have presented a question as to whether Hicks

11  demonstrated medical negligence.  The law is clear that "mere negligence in diagnosing or treating a

12  medical condition, without more, does not violate a prisoner's Eighth Amendment rights."

13  McGuckin, at 1059.  What Plaintiffs have not demonstrated is that Hicks deprived Provencio of his

14  rights under the Eighth Amendment.  Therefore, Hicks' motion for summary judgment on the Third

15  Cause of Action is recommended to be **GRANTED.**

16              **b.     There is no dispute of fact that demonstrates that Drugich's action**

17                      **violated the Eighth Amendment**

18         Drugich's first contact with Provencio was while he was still in the room where the incident

19  had occurred.  Drugich approached Provencio and attempted to provide him medical care.  (UMF 36)

20  However, Provencio cursed at her and spat at her.  (UMF 36) Although Provencio's belligerence

21  continued, either on the way to the medical treatment area or when they arrived there, Drugich

22  adjusted the spit mask that Provencio wore to allow better breathing.  (UMF 38) In response,

23  Provencio cursed at Drugich. (UMF 38) At the treatment area, Drugich and Hicks removed the spit

24  _____

25  [9]Even assuming this is true, although Clark fails to evidence that in this prison setting that the standard of care required this, Clark does not explain why Hicks and Drugich would have been impervious to the health risks associated with saliva and blood being spat on them.  At his deposition, however, he acknowledged the risks of contracting tuberculosis from

26  inhaling an infected person's saliva.  Nevertheless, although he, apparently, is unconcerned about contracting tuberculosis, he fails to describe that the applicable standard of care required Hicks and Drugich to be similarly unconcerned.  More

27  importantly, he provides no evidence that the Constitution required this.  Likewise, Plaintiffs have failed to cite to any authority that the defendants' refusal to be subjected to the risk of contracting a terminal or chronic illness constitutes

28  deliberate indifference to Provencio's medical condition.

1   mask to provide medical attention to the head wound after Provencio agreed not to spit at them.

2   (UMF 40) Nevertheless, when the two removed the mask, Provenio spat at them.  (UMF 40) During

3   the entire time that Drugich remained in the treatment area, Provencio was combative and aggressive

4   and refused to allow medical staff to treat him.  (UMF 41)

5       Although Drugich knew that Provencio had a "bad head wound," given the size of the gash

6   and the amount of blood, there is no evidence that Drugich knew that Provencio had suffered a brain

7   injury.  Likewise, although Drugich may have believed, initially, that Provencio's injury was "a bad

8   head wound," she deferred to and relied upon the superior medical training of Hicks and the other

9   registered nurse present, who did not believe that the injury was more serious than a gash that needed

10  stitches.  Thus, for the same reasons set forth in the discussion related to Hicks, the Court concludes

11  that Plaintiffs may have presented a question as to whether Drugich demonstrated medical

12  negligence but they have failed to counter the evidence that Drugich was not deliberately indifferent

13  to Provencio's serious medical need.  Therefore, Drugich's motion for summary judgment on the

14  Third Cause of Action is recommended to be **GRANTED.**

15              **c.       Plaintiffs admit that defendant Vasquez was not deliberately**

16                     **indifferent to Provencio's serious medical need.**

17      Plaintiffs offer a set of "disputed" material facts at the end of their response to the defendants

18  separate statement of undisputed facts. (Doc 184 at 46) Plaintiffs' "Disputed Material Facts" Fact

19  number 5, Plaintiffs indicate, "Warden Vasquez was not deliberately indifferent to Provencio's

20  serious medical needs." <u>Id.</u> Plaintiffs then indicate, "Undisputed." <u>Id.</u> Given that Plaintiffs fail to

21  offer any argument that Vasquez was, in fact, deliberately indifferent to Provencio's serious medical

22  need, the Court accepts Plaintiffs' concession and determines that there is no triable issue of material

23  fact on this issue.  <u>Id.</u>  Therefore, it is recommended that Vasquez's motion for summary judgment

24  on the Third Cause of Action be **GRANTED.**

25          **E.      Vasquez has established that she is entitled to judgment on the Fourth Cause of**

26                 **Action**

27      In the Fourth Cause of Action, Plaintiffs contend that Vasquez failed to provide the proper

28  medical attention to Provencio before he was transferred to an area hospital.  However, as noted

1   above, Plaintiffs concede that Vasquez was not present at the time of the incident involving

2   Provencio (UMF 53) and concede that she was not deliberately indifferent to Provencio's serious

3   medical condition. (Doc 184 at 46)  Given that Plaintiffs fail to offer any argument in their

4   opposition that Vasquez was present and responsible for providing medical care to Provencio or that

5   she was, in fact, deliberately indifferent to Provencio's serious medical need, the Court accepts

6   Plaintiffs' concession and, thereon, recommends that Vasquez's motion for summary judgment on

7   the Fourth Cause of Action be **GRANTED.**

8           **E.      Vasquez, Paredes, Hicks and Drugich have established that they are entitled to**

9                    **judgment on the Fifth Cause of Action**

10          The Fifth Cause of Action alleges that Provencio Jr. has suffered a deprivation of his

11  Fourteenth Amendment right to the familial relationship with his father, Provencio.  In support of

12  this assertion, he relies upon the allegations raised in the First through Fourth Causes of Action.  For

13  the reasons set forth above in the discussions related to these causes of action, the Court recommends

14  that motions for summary judgment brought by Vasquez, Paredes, Hicks and Drugich on the Fifth

15  Cause of Action be **GRANTED**.

16          **F.      Vasquez, Paredes, Hicks and Drugich have established that they are entitled to**

17                   **judgment on the Sixth Cause of Action**

18          The Sixth Cause of Action alleges that Plaintiffs Nancy Mendoza and Johnny Gallegos have

19  suffered a deprivation of their Fourteenth Amendment right to their familial relationship with

20  Provencio based upon the actions of Vasquez, Paredes, Hicks and Drugich.  They rely upon the

21  allegations raised in the First through Fifth Causes of Action.  Because the Court finds that these

22  defendants are entitled to summary judgment as to the foregoing causes of action, for the reasons set

23  forth above in the discussions related to these causes of action, the Court recommends that the

24  motions for summary judgment brought by Vasquez, Paredes, Hicks and Drugich on the Sixth Cause

25  of Action be **GRANTED.**

26          **G.      Palmer has not demonstrated that he is entitled to summary judgment on the**

27                   **Fifth Cause of Action**

28          As previously noted, the Fifth Cause of Action alleges that Provencio Jr. has suffered a

1   deprivation of his Fourteenth Amendment right to the familial relationship with his father,

2   Provencio.  As to Palmer, he relies upon the allegations the raised in the First Cause of Action.  As

3   explained above, the evidence, when taken most favorably to the Plaintiffs, creates a dispute of

4   material fact as to the lawfulness of Palmer's action.

5          On the other hand, though the parties argue extensively over the test the Court should use to

6   determine whether liability may be imposed on the Fifth Cause of Action, a determination on this

7   topic is unneeded.  The Court determines that an officer who purposefully aims and then shoots a

8   rubber projectile at the head of a compliant inmate commits an act that "shocks the conscience."

9   Because this test is more deferential to the officer's action than the deliberate indifference test,

10  clearly, liability would be imposed under either standard.

11         Based upon the disputes of fact that warrant denial of Palmer's motion for summary

12  judgment as to the First Cause of Action the Court recommends that Palmer's motion for summary

13  judgment on this Fifth Cause of Action be **DENIED.**

14  **H.     Palmer has not demonstrated that he is entitled to summary judgment on the**

15  **Sixth Cause of Action**

16         For the same reasons set forth above as to the Fifth Cause of Action, the Court recommends

17  that Palmer's motion for summary judgment on this Sixth Cause of Action be **DENIED.**

18                              <u>**RECOMMENDATION**</u>

19         Based on the foregoing, the Court recommends,

20  1.     That the motion for summary judgment on the First Cause of Action against

21         defendants Paredes, Hicks and Drugich be **GRANTED**;

22  2.     That the motion for summary judgment on the First Cause of Action against

23         defendant Palmer be **DENIED**;

24  3.     That the motion for summary judgment on the Second Cause of Action against

25         defendant Vasquez be **GRANTED**;

26  4.     That the motion for summary judgment on the Third Cause of Action against

27         defendants Vasquez, Paredes, Hicks and Drugich be **GRANTED**;

28  5.     That the motion for summary judgment on the Fourth Cause of Action against

defendant Vasquez be **GRANTED**;

6.   That the motion for summary judgment on the Fifth Cause of Action against defendants Vasquez, Paredes, Hicks and Drugich be **GRANTED**;

7.   That the motion for summary judgment on the Fifth Cause of Action against defendant Palmer be **DENIED**;

8.   That the motion for summary judgment on the Sixth Cause of Action against defendants Vasquez, Paredes, Hicks and Drugich be **GRANTED**;

9.   That the motion for summary judgment on the Sixth Cause of Action against defendant Palmer be **DENIED**.

These Findings and Recommendations are submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within fourteen days after being served with a copy, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."   Replies to the objections shall be filed within fourteen days after service of the objections. The District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  Failure to file objections within the specified time may waive the right to appeal the District Judge's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **June 16, 2010**                                                    **/s/ Jennifer L. Thurston**
                                                                           UNITED STATES MAGISTRATE JUDGE